E. W. BLISS COMPANY, Plaintiff,

v.

COLD METAL PROCESS COMPANY and
Union National Bank of Youngstown,
Ohio, Trustee, Defendants.

UNION NATIONAL BANK OF YOUNGS-
TOWN, OHIO, Trustee, Plaintiff,

v.

GREER STEEL COMPANY, Defendant.

UNION NATIONAL BANK OF YOUNGS-
TOWN, OHIO, Trustee of the Leon
A. Beeghly Fund, Plaintiff,

v.

E. W. BLISS COMPANY, Defendant.

E. W. BLISS COMPANY, Plaintiff,

v.

COLD METAL PRODUCTS COMPANY,
Defendant.

Equity No. 5402;

Civ. A. Nos. 24189, 26542, 31849.

United States District Court
N. D. Ohio, E. D.

May 8, 1959.

On Motion to Correct Opinion
June 2, 1959.

Charles H. Walker, Stuart A. White, Donald E. Degling, New York City, Charles W. Williams, Cleveland, Ohio, for plaintiffs.

William H. Webb, Morton Burden, Jr., Joseph R. Robinson, Jr., John M. Webb, Pittsburgh, Pa., Howard F. Burns, Cleveland, Ohio, for defendants.

WEICK, District Judge.

### The Consolidated Cases.

These four actions were consolidated for trial.

They involve the validity, scope and infringement of three patents for improved mills and methods for the rolling of hot and cold metal in strip or sheet form.

The patents in suit are: No. 1,744,-016 ('016) issued January 14, 1930 on an application filed June 30, 1923 by Abram P. Steckel, hereinafter referred to as Steckel; No. 1,779,195 ('195) issued October 21, 1930 on an application filed December 9, 1929, as a division of the original Steckel application; No. 2,706,-422 ('422) issued April 19, 1955 on an application filed May 2, 1947 by William B. Lockwood, hereinafter referred to as Lockwood.

Steckel assigned his applications for patent to the Cold Metal Process Company, an Ohio corporation, hereinafter referred to as Cold Metal, and the patents were issued to that company. Thereafter, pending this litigation, the Steckel patents were assigned to the Union National Bank of Youngstown, Trustee of the Leon A. Beeghly Fund.

The Lockwood patent was first assigned to the Cold Metal Products Company, an Ohio corporation and thereafter through mesne assignments to the Youngstown Research & Development Company, an Ohio corporation.

E. W. Bliss Company, hereinafter referred to as Bliss, is a Delaware corporation having a place of business in Salem, Ohio and is engaged in the manufacture and sale of rolling mills.

Greer Steel Company, hereinafter referred to as Greer, is a West Virginia corporation having a place of business at Dover, Ohio and is a user of rolling mills. It purchased several mills from Bliss and others from United Engineering & Foundry Company, hereinafter referred to as United.

### 1. Equity No. 5402.

This action was filed by Bliss against Cold Metal on January 20, 1936 seeking a declaratory judgment with respect to the validity and infringement of Steckel Patent Nos. '016, '195 and two other patents which were eliminated from the case at a pre-trial conference.

On motion of Cold Metal, the complaint was dismissed on April 12, 1937 for lack of a justiciable controversy. On appeal, the order of dismissal was reversed. 6 Cir., 1939, 102 F.2d 105. Cold Metal filed its answer on May 20, 1939, but asserted no counterclaim at that time.

A motion for summary judgment by Bliss as to the validity of Patent No. '195 was denied. D.C.1942, 47 F.Supp. 897.

In 1947, after the patents had expired, and the issues had become moot, Cold Metal and the trustee moved for leave

to file a counterclaim charging Bliss with infringement of Patent Nos. '016 and '195. Bliss then moved to dismiss the complaint. Leave to file the counterclaim was granted and it was filed on May 26, 1950. The motion to dismiss was denied.

Bliss thereafter moved to dismiss the counterclaim with respect to all mills sold by it more than six years prior to the date of the filing of said counterclaim. It asserted that such claims were barred by the Statute of Limitations. The motion was denied by the Court for the reason that the filing of the declaratory judgment action had tolled the Statute of Limitations. D.C.1957, 156 F.Supp. 63.

This case is the oldest one on the docket of the Court. It was filed at a time when the Court had separate dockets for law and equity cases which long since have been abolished.

### 2. Civil Action No. 26,542.

This action charges Bliss with infringement of Patent Nos. '016 and '195. The issues are the same as Equity No. 5402.

It is claimed by Cold Metal that this action was a precautionary suit to stop the running of the Statute of Limitations in the event it was held that the Statute was not tolled by the filing of Equity No. 5402.

### 3. Civil Action No. 24,189.

This action charges Greer with infringement of Patent Nos. '016 and '195 by reason of its use of mills which it purchased from Bliss and United.

### 4. Civil Action No. 31,849.

This action was instituted by Bliss for a declaratory judgment with respect to the validity and infringement of Lockwood Patent No. '422. A motion to dismiss for lack of a justiciable controversy was denied by the Court.

The trial of the consolidated cases lasted for more than two months. One week was spent by the Court with counsel in viewing rolling mills in six different states. A total of 768 exhibits were offered in evidence, some of which were depositions and testimony of witnesses stipulated from the records of other cases.

### Mill Types

In a 2-high mill there are only two rolls which are at different elevations. A sketch of a model 2-high mill with all its essential parts identified is reproduced below.

TWO HIGH MILL

A similar sketch of a model 4-high mill is also reproduced. It has rolls at four different elevations. The two rolls in the center are called working rolls each of which is supported by a backing roll.

FOUR HIGH MILL

A 4-high mill permits the use of smaller working rolls in a wide mill than does a 2-high mill because of the support provided by the backing rolls.

If small working rolls were used on a 2-high mill, they would not be able to withstand the heavy pressures required for substantial reductions of metal and the rolls would tend to bow apart. The 4-high mill with large backing rolls provides the necessary support for small working rolls, prevents bowing and permits their use for heavy reductions.

The sketch below illustrates the roll arrangement of 2-high, 3-high, 4-high and cluster mills with the strip between the rolls.

Mill Types

It will be noted that in the cluster mill the working rolls are nested in the crotch between the backing rolls thus obtaining horizontal as well as vertical support. A mill other than the 2-high mill is usually referred to as a backed up mill, because the work roll or rolls are supported or backed up by backing rolls.

### Patent No. '195.

In Steckel's original application for patent filed June 30, 1923 he presented claims for a mill with small working rolls and relatively large backing rolls. The backing rolls were to be mounted on anti-friction bearings (roller bearings). In addition, he presented claims for the application of tension on the strip as a driving force of the mill. In 1929 the Patent Office required division of the claims involving tension as a means for driving the mill and those for the mill stand per se. This resulted in the application, filed on December 29, 1929, upon which Patent No. '195 issued.

Claims 3, 4, 6, 7, 8 and 11 to 17 of that patent are here in suit. It is unnecessary to pass on the remainder. No infringement is charged as to them and, the patent having expired, their validity is moot.

The claims in question are all mill claims. Claims 8, 11, 12 and 16 specifically relate to continuous mills, while the remainder describe single mill stands. Basically, they define a 4-high mill with antifriction bearings on the backing rolls.

At the time of Steckel, and long prior thereto, antifriction bearings were understood in the art as meaning ball or roller bearings as distinguished from friction or sliding bearings on which one metal surface would slide over another without the interposition of balls or rollers.

The claims vary from one another in that some refer to the control of roll neck heating by the application of roller bearings while others refer to the possibility of obtaining greater speeds through the use of the roller bearings.

In the claims appears language which, to my point of view, is simply excess verbiage describing a properly designed backing roll or roller bearing. Examples of this are found in Claims 3, 4, 8, 13 and 14 wherein it is stated:

> * * * the backing rolls having necks of sufficient size to withstand the rolling pressure * * *

Any competent mill builder would design his mill so that the roll necks would withstand the rolling pressures. To do otherwise would be sheer folly.

By the same token, several of the claims describe the bearings to be used as "of sufficient size to withstand the rolling pressure" (Claims 8, 14 and 17) or "of such character as to withstand speeds which are high relative to those ordinarily employed" (Claims 4, 7, 8 and 13). To say this in a patent relating to a mill intended to be run at a high speed and to make heavy reductions is only to say use an adequate roller bearing. Again, an engineering fundamental.

Stripping the claims of the verbiage and looking to their essentials they disclose a 4-high mill with roller bearings on the necks of the backing rolls.

The advantages claimed for this mill are expounded in the specifications.

> "By my invention the limitations of speed on both hot and cold mills are removed.
>
> * * * * * * *
>
> "Where the roller bearings are applied to the backing roll necks they eliminate the heating of such necks, which heat adversely affects the shape of the working roll body.
>
> * * * * * * *
>
> "My invention is also highly advantageous in that the amount of power required is markedly reduced
> * * *
>
> * * * * * * *
>
> "By the use of my improved mill these high speeds may be readily attained and this with relatively low power requirements."

It stands admitted that the proportions of the 4-high mill stand per se shown in Patent No. '195 are to be found in the prior art. They are closely akin to those of the Newton Patent (Br. No. 1234/1863).

Thus, the question at hand resolves itself to whether invention resides in the application of roller bearings to the necks of the backing rolls of a conventional 4-high mill. Concurrent with this is the issue of whether the advantages claimed

in '195 are a product of a new environment.

The use of the roller bearing itself was old in the rolling mill art. In an 1895 article the rolling mills of the Mossberg Mfg. Co. are described.

> "These apparatus [rolling mills] are suitable for the rolling of * * even sheet steel; the fact that their trunnions are mounted in roller bearings imparts to them an exceptional ease of operation which manifests itself in a considerable saving of the power consumed as compared with the power usually required.

> "The substitution of a roller bearing for friction bearings under considerable load is not a recent change; it attracted the attention of research workers for many years. Revue Industrielle, No. 44, Nov. 2, 1895."

The Mossberg mills referred to are illustrated and described in that firm's catalogue of March 1896. Therein it is claimed that:

> "The Mossberg Roller Bearing is fitted to the journals of the rolls. This latter feature enables us to build a mill which will do its work double as fast as the ordinary mill with less than one-half of the driving power, for with Roller Bearings there is scarcely any friction on the roll journals and consequently no heating of the rolls.

> * * * * * * *

> "After placing a set of these bearings on any machine we can safely guarantee the total absence of heating from friction and a savings of forty to eighty per cent of the power previously used * * *"

That these claims were not merely sales puffing is reflected in a number of testimonials in the catalogue. Among them is a letter from Browne & Sharp Mfg. Co. That concern stated they had put Mossberg bearings on a mill used for rolling sheet steel, and as a result were able to reduce their mill powering and run the mill ten hours a day with no roll heating. Previously their mills had to lie idle two to three hours a day because of excessive roll heating.

This notice to the engineering world of the advantages of roller bearings was repeated in the firm's 1902 catalogue (p. 19). However, the company recognized that the roller bearings of that day were not a universal panacea for the rolling mill industry's troubles. The admonition is given:

> "As yet, Roller Bearings are not universally perfect, nor is their efficiency practically known, except under certain conditions.

> "A time may come when they can be applied indiscriminately under every condition, but until that time comes, it is necessary to make a special study of each application of Roller Bearings so as to avoid mistakes."

Another mill builder, the Standard Machinery Co., also extolled the virtues and advantages of roller bearings, specifically mentioning the increased speeds, decreased power requirements and absence of roll heating. In their 1920 catalogue several 2-high mills equipped with roller bearings are offered to the public.

The publication "Iron Age" reporting on the use of roller bearings on a rod mill stated:

> "The introduction of these roller bearings constitutes a distinct and important advance in rolling mill machinery of this type, and it is highly probable that before long it will find application with heavier work.

> * * * * * * *

> "By the use of roller bearings the product of the mill can be increased in two ways. First, the rolls can be run at a higher rate of speed. Second, much heavier strain can be taken than with plain bearings.

> "Numerous tests on this class of work, especially cold rolling mills, show a saving in power of from 25 per cent to as high as 75 per cent. Iron Age, April 7, 1898."

Here then in the pre-Steckel publications we see full disclosure of the advantages to be derived from the use of roller bearings on a cold rolling mill. Admittedly, the uses therein described were on 2-high cold mills of a relatively small size which took light reductions. However, each of the advantages claimed to be secured by the Steckel invention are therein described as being a normal attribute of the use of roller bearings on a rolling mill—higher speeds, reduced power requirements and elimination of roll heating.

The obvious question then is if this principle of the utility of roller bearings was so well known why wasn't it applied to a 4-high cold reducing mill capable of taking substantial reductions prior to the 1920's.

Bliss and Greer contend that it was so used. Assuming for the moment that it was not, a partial explanation why not is also to be found in the pre-Steckel publications.

As late as 1918 it was written that probably no other feature of steel mill design was more neglected than that of bearings. *The Iron Trade Review*, Vol. 63 p. 94.

Four years earlier, an article appeared in the English publication *Engineering* entitled "The Design of Rolling-Mills for Cold Metal." Therein it was observed:

"The subject of roll bearings cannot be concluded without a word respecting the use of roller bearings. Bearings of this class are usually considered to be impracticable for mills; nevertheless, the writer is inclined to think that a roller bearing could be designed to take the heaviest loads, and if such is the case, there is no doubt a great economy of power would result from their use.

\* \* \* \* \* \* \*

"The obstacle in the way of experimenting with roller-bearings on a larger scale is that none of the manufacturer's specializing in roller bearings can, so far as this writer's experience goes, put forward a bearing of suitable dimensions."

The roadblock in the path of the development of the roller bearings was a mechanical one.

"Like most other improvements in mechanical lines, the ball or roller bearing is coming because the time is ripe for it. The principle is a very old one, but years ago, when such bearings were tried the desideratum was accurate and hard balls and bearing surfaces. This desideratum could not be met with the tools and implements then at command. *Tin and Terne and the Metal World,* Vol. VI, No. 16 (Aug., 1897)."

The importance of proper methods and materials in relation to the construction of an adequate bearing is emphasized in a discussion of the Mossberg Bearing.

"The efficiency of the bearing depends perhaps as much upon the skill with which it is manufactured as upon the design. The shaft and bearing, as well as the rollers and their bearings in the cage, must be absolutely cylindrical. The slightest variation would impair the bearing and practically eliminate its frictionless quality. *The Iron Age,* April 7, 1898."

These difficulties in minute accuracy required would necessarily increase as the size of the bearing which one was attempting to build increased, and a large bearing is necessary to withstand the heavier rolling loads.

Besides these technological drawbacks a further impediment to the adoption of roller bearings is spoken of—the human factor.

"Mechanical men, however, are very skeptical on the life of Roller Bearings as their experience with a great variety of cheap and wrongly applied Bearings has led them to condemn all Roller Bearings. *Catalogue of Mossberg & Granville Mfg. Co.,* p. 17 (4th Ed., 1902).

"Above all, however, the roller bearing has to overcome the strong prejudice which a long, and hitherto uninterrupted, record of failures has naturally raised against it. Old mechanics say:—

" 'Yes, we tried roller bearings twenty-five years ago. They didn't work.' *Cassier's Magazine,* Vol. XII, p. 68 (1897)"

The most searching statement found relating to the development of the use of roller bearings for industrial machinery is in a 1900 publication.

"Nevertheless, the theoretical advantages of the roller bearing have always been *too obvious to allow it* to be abandoned as impossible, and inventors have constantly been attracted to it. It was not, however, originality that was required to bring it to perfection, but suitable materials and sound mechanical knowledge.

"The subject is full of interest for mechanics for it shows that many of the insoluble problems of twenty years ago become possible with modern materials and processes. When shown a device of this kind, it is very natural to say that it has been tried and failed and it is not worth considering. But it has always been tried under more adverse circumstances than the present, and it is possible that the cause of failure lay in some small difficulty which no longer exists. Everyone who has tried, knows that it is the details of progress which give the trouble; the main features are generally fairly easy; it is the little matters which trip us up. This has certainly been the case with the roller bearing; the general design was complete 50 years ago, but the mechanical execution has only recently been perfected. *Engineering,* Vol. LXIX, p. 133 (1900)"

It thus appears that prior to Steckel the principle of the roller bearing was well known, the advantages to be derived from its use widely proclaimed and enjoyed by the users of 2-high mills, but that technological obstacles and human stumbling blocks existed to the development and adoption of a roller bearing for devices which exerted extremely high pressures, such as a large cold reducing mill.

With this background of the widespread notice of the utility of roller bearings in mind the prior art patents can now be considered.

Cold Metal concedes, as previously mentioned, that the basic mill structure of '195 is to be found in the prior art. It is likewise uncontroverted that none of the prior art patents relied upon by Bliss and Greer disclose the identical structure of the '195 patent—a 4-high mill with roller bearings on the backing rolls. A 4-high cluster mill was the closest approach to it.

In Exhibits OX-9, OX-11 and OX-12 nine prior art references are cited as disclosing the principle of the roller bearing as an expedient on a rolling mill.

The Dostal patents (Austrian Nos. 77,898 and 81,024 and American No. 1,-453,239) and the Roberts patent No. 1,378,559 relate to an antifriction bearing per se, and are not mill patents. However, Dostal 77,898 is directed to a bearing to be used on the neck of a mill roll, with no qualification as to whether it is to be a working roll or a backing roll.

Brightman Patent No. 564,302 is for a wire drawing mill. Although the general term antifriction bearing is used therein, the bearing shown is a ball bearing. The mill is a 2-high type for a special purpose. It cannot be said that this patent discloses the utility of roller bearings as does '195.

Kynoch (Br. No. 12,006/1898) is a 2-high mill for cold rolling metals, particularly brass. The drawings unquestionably show roller bearings on the roll necks and the specifications refer to them as such.

The three most important patents cited are Somers (800,950), Kriwan (1,360,-959) and Wilmot (1,071,846). These patents were before the Patent Office and the grounds upon which they were therein distinguished will be considered.

Somers is a patent on a 4-high rolling mill with roller bearings on the work rolls. The Patent Office repeatedly took the position that there was no invention in providing all the rolls (or the backing rolls) of a 4-high mill with roller bearings as shown at 6 of Fig. 2 of Somers.

This patent was cited three times in rejection of claims on a 4-high mill with antifriction bearings—once in the prosecution of abandoned Biggert and Johnson Application, Serial No. 103,264[1] and in the prosecution of Steckel Patent Nos. 1,744,016 and 1,744,018.[2]

When Somers was cited as a reference in the prosecution of Steckel '016 all the claims against which it was asserted were cancelled.

In the prosecution of Steckel '018 the Examiner rejected original Claims 1, 2 and 3 on the ground that there would be no invention in providing the backing rolls with such roller bearings as are provided for the [Somers] working rolls.

In answer to this Steckel's counsel stated:

"We recognize the force of the Examiner's position as to Claims 1, 2 and 3 * * * We take issue with the Examiner's position that there would be no invention in providing the backing rolls of Somers with anti-friction bearings, but have rewritten the claims so as to recite in terms of structure the driving of the mill by tension on the strip."

In answer to the Examiner's citation of Somers in Biggert and Johnson, counsel stated that the reference was inapplicable in that the work rolls did not take the rolling pressures in a 4-high mill, and requested reconsideration of the rejection. Before any action was taken on that request the application was abandoned in favor of Biggert and Johnson Application No. 228,176, which was stated to be a continuation in part of Application 103,264.[3]

In this latter application the official position of the Examiner on Somers does not appear, as that patent was discussed in an oral interview. The applicant's contention remained the same, as shown in an amendment of November 22, 1927. Biggert and Johnson Patent No. 1,654,-

1. Biggert and Johnson Application for Patent Serial No. 103,264 was filed on April 20, 1926. The applicants were President and Chief Engineer, respectively, of United and assigned the application to that Company. It was filed by the same firm of attorneys that filed the Steckel applications. The application disclosed a 4-high mill with backing rolls larger than the working rolls. The working rolls appear to be larger than shown in Steckel's application. The working rolls and one of the backing rolls may be driven. The backing rolls were mounted on roller bearings, which was the essence of the invention. No claims were asserted in the application for tension on the strip. The claims presented in this application were ultimately allowed, but then awarded to Steckel in interference proceedings. Therefore, the actions of the Patent Office on this application are pertinent to this case.

2 Steckel '018 originally contained claims very much like those granted in '195. As it issued, it related basically to means

for lubricating and wiping a rolling mill. It was held invalid for lack of invention. Cold Metal Process Co. v. Carnegie-Illinois Steel Corp., 3 Cir., 1940, 108 F.2d 322. It is one of the patents eliminated from this case at pre-trial.

3. Biggert and Johnson Continuation Application No. 1,654,235 was filed October 27, 1927 and resulted in Patent No. 1,-654,235 being issued on December 27, 1927 which was assigned to United. It discloses a 4-high mill with larger backing rolls than the work rolls. The work rolls are driven. The backing rolls are mounted on roller bearings which it was claimed permits the mill to be operated at greater speed, accurate control of the shape of the roll pass, elimination of roll neck heating, prevention of buckling or wrinkling of the strip and rolling to thinner gauges.

In interference proceedings, the claims of this patent were awarded to Steckel by default and became part of Steckel Patent No. '195. More will be said about this later.

235 issued on this application, without any prior art references having been cited by the Examiner.

It is argued that the '235 patent was obtained by virtue of the commercial success of the mills installed by United at Rome, New York and Butler, Pennsylvania which embodied the Biggert and Johnson conception. The claim is made that the Patent Office was overwhelmed by the commercial success of these mills and issued the patent notwithstanding the borderline degree of invention shown by the prior art.

■ Consideration of the Biggert and Johnson file wrappers convinces one that this is not altogether without foundation. I feel, therefore, that the granting of '235 over Somers does not bear the same weight as if the Patent Office had granted it on the basis of a clear cut distinction between the two structures.

Thus, the situation with reference to Somers is that of the three times it was cited by the Patent Office as invalidating claims for a 4-high mill with roller bearings on the backing rolls, once the claims were cancelled, once the claims were amended to include tension drive as a feature of the mill, and the third time the application was abandoned in favor of a continuation application urging commercial success as a basis for patentability.

Looking at Somers from the point of distinction raised by applicants in the Patent Office, their position is only partially sound. It is true, as they contended, that the rolls with roller bearings in Somers did not take the brunt of the rolling pressures and thus had no roll neck heating to overcome. On the other hand, the Somers mill was a "hot roll" mill, and, therefore, roll neck heating was not a detriment. The application of roller bearings to the work rolls would necessarily allow rolling at higher speeds with less power, as the prior art publications teach. Thus, Somers could obtain whatever advantages would accrue to his

particular type of mill by the use of roller bearings without putting them on the backing rolls.

Kriwan (1,360,959) shows a 4-high mill with roller bearings on the backing rolls. The mill differs from Steckel in that it is a bar, or billet, five-pass mill and the rolls are divided into five sectors, each of which is of a progressively larger diameter. The roller bearings are not on the roll necks (the mill had no roll necks), but are between each backing roll and its arbor. Thus, a series of five backing rings for the five steps of the work rolls results.

When Kriwan was cited against claims for a simple 4-high mill with roller bearings in the prosecution of Steckel '016 the claims were thereupon cancelled.

By the same token, in the prosecution of Steckel 1,744,017 [4] the claims describing a 4-high mill with roller bearings on the backing rolls were amended to include the element of tension when Kriwan was cited against them.

Kriwan was also relied upon by the Examiner in the Biggert and Johnson prosecution:

"Claims 18 and 19 are rejected as not patentable over Somers or Kriwan. There would be no invention in providing bearing for the backing rolls of Somers of the same type as are provided for the working rolls and in Kriwan each collar b is the equivalent of a backing roller and has anti-friction bearings."

Counsel answered:

"The Kriwan patent shows a pair of stepped rolls, each step being provided with an anti-friction ring. It is not a mill of the type defined in the references and obviously could not be modified to meet applicant's structure, because it would be impossible to drive the rings shown in Kriwan."

---

4. Steckel '017 issued as a process patent. It was characterized as an engineering improvement over '016 and '195 and held invalid in Cold Metal Process Co. v. Carnegie-Illinois Steel, supra. It is the other patent eliminated from this suit at pre-trial.

This point of distinction, the inability to drive the backing rings, is valid for Biggert and Johnson, but not Steckel. Biggert and Johnson showed a drive to the lower backing roll, and it is this they claim Kriwan couldn't do. Steckel had no such backing roll drive.

The Patent Office was obviously unimpressed with this argument, for it came back with another rejection, stating:

> "All that applicants have done is to provide anti-frictional bearings for the brace or backing rolls. Ball and roller bearings are now so common that to supply them in any bearing is not invention as they may be said to be universal to the mechanical arts. The applicants have therefore made no patentable invention."

Faced with this flat rejection applicants changed their tactics. All prior claims were cancelled, new ones filed, and a lengthy argument based on the commercial success of the mill was presented. Therein Kriwan was distinguished as not having roll necks and consequently having no roll neck heating problem to overcome. It was at this point that the application was abandoned, and as previously stated the application on which the patent finally issued contained no prior art references at all.

Thus, the history of Kriwan before the Patent Office shows that when asserted against claims of a 4-high mill with roller bearings on the backing rolls the claims were cancelled in '016 and amended in '017. As far as Biggert and Johnson is concerned, the distinctions attempted to be made were rejected, although the patent finally issued on the basis of the mill's commercial success.

Further distinctions between Kriwan and Steckel were made during the trial. It was pointed out that the mill could not roll to the gauges and widths of the 4-high sheet mills. The difference in roll construction was pointed to with extreme emphasis.

While all the variances would operate to bar Kriwan as an anticipation, they do not have the same effect on the question of invention. Is each person who puts a roller bearing on a different type of rolling mill and utilizes the benefits to be derived therefrom entitled to a patent thereon?

Further, viewing only one section of the Kriwan five steps alone, virtually the exact form or replica of the first mill Steckel built, which is described and claimed in '016, is seen. Steckel's original mill was of the backing ring variety and had no roll necks. (He did not build a mill with roll necks until 1929). The bearing arrangement on it was identical with that shown for each of the individual sections of Kriwan.

Finally, the Wilmot Patent No. 1,071,-846 is relied upon to invalidate '195. Bliss and Greer contend that Wilmot represents a complete anticipation of Steckel.

Cold Metal has taken the position that Wilmot cannot be considered as an anticipation in that it is a cluster mill and, therefore, distinct from the 4-high of the Steckel patent. As before stated, in a cluster mill, each working roll rests in the crotch between two backing rolls thus providing horizontal as well as vertical support for the working rolls. In a 4-high mill only vertical support is provided for the working rolls by a single backing roll.

From the testimony given at the trial it appears that the principles of the 4-high and cluster mills are substantially the same. Dispositive of this contention is the fact that the Alcoa Foil Mill (OX–2, pp. 2–3, item 14) and the Stamford Rolling Mills (OX–2, pp. 2–3, item 15), both cluster mills, are charged to infringe '195. If a cluster mill is capable of infringing '195 it is also capable of anticipating it. Commercial Mfg. Co. v. Fairbank Canning Co., 1890, 135 U.S. 176, 10 S.Ct. 718, 34 L.Ed. 88.

Considerable controversy existed at the trial on the question of whether the Wilmot patent disclosed roller bearings on the backing rolls. No mention of roller bearings, or antifriction bearings, appears in the text of the patent. In

the drawings, Fig. 2, a series of small markings appear around the neck of the upper left backing roll. An enlargement of this portion of the drawing was received in evidence and shown to several witnesses.

It is around these circles the argument revolves. Most of Cold Metal's witnesses couldn't see that they were a representation of roller bearings, while Bliss-Greer's could. However, Cold Metal's witness, James T. Reynolds, did interpret the patent drawings as disclosing roller bearings. My conclusion is that the drawing does show a row of circles around the neck of the backing roll from which it can be concluded the backing roll was to be equipped with roller bearings.

The mills actually constructed following this patent were in fact equipped with a form of roller bearing on the backing rolls, and the drawings for said mills contain a detailed sketch of a roller bearing.

It was not controverted that Cold Metal had represented to the Royalty Adjustment Board in a hearing before said Board that the Wilmot patent did disclose roller bearings on the backing rolls.

The Wilmot patent is of record in the file wrapper of '016. However, Bliss and Greer contend that the Patent Office was not aware of the fact that the patent disclosed roller bearings on the backing rolls. The only time Wilmot is to be found in the '016 file wrapper is as follows:

"Division is required between machine Claims 1 to 13 inclusive and process Claims 14 to 25 inclusive. The process could be carried out by other machinery than that specifically claimed. The process of Claim 14 could be carried out by apparatus as shown in Wilmot 1,071,846 Sept. 2, 1913 80–38 *No action on the merits of claims will be given until the question of division has been disposed of."* (Emphasis added.)

Claim 14, to which reference is made, read:

"The process of cold rolling strips, comprising pulling a strip past a relatively small reducing roll having anti-friction backing, substantially as described."

It is obvious that Claim 14 does mention antifriction backing. This does not necessarily mean that the Examiner was aware of the fact that Wilmot had roller bearings. His reference to Wilmot was in the category of "other machinery" on which the pulling process could be carried out. It is conceivable that the reference to Wilmot was in relation to the feature of small working rolls, also embraced in Claim 14.

The thought that the reference to Wilmot was meant to cover small work rolls is strengthened by later actions of the Patent Office. When it came to the first consideration of the patent on the merits Claim 14 was rejected on Windlund in view of Mathey or Somers. No mention was made of Wilmot. In the prosecution of Steckel '017 Wilmot '846 was referred to as disclosing the use and utility of small working rolls.

Cold Metal claims that Steckel himself discussed the disclosures of Wilmot '846 in a personal interview at the Patent Office. Testimony given by him in the Cancellation case[5] was offered to establish that fact.

In that case Steckel testified that he recalled that the Wilmot patent was cited against him and the oral interview followed. The file wrappers, as stated, show that it was never raised on the merits. Furthermore, while quite a bit of the patent prosecution was carried out by personal interview, the gist of the discussions and those patents considered were supposedly embodied in amendments following each interview. Nowhere in the file wrappers is there any document showing that Wilmot was ever discussed.

In my judgment, Wilmot Patent No. '846 was the most relevant prior art

---

5. United States v. Cold Metal Process Co., D.C., 62 F.Supp. 127, affirmed 6 Cir., 1947, 164 F.2d 754.

patent. The file wrappers of the Steckel patents do not disclose whether the Patent Office knew that Wilmot had roller bearings on the backing roll necks. If the Patent Office did have such knowledge, it is not understandable why no mention was made of this fact in any of its actions.

■ The mills constructed following the Wilmot patent, referred to as the Bridgeport or Keating cluster mills, are relied upon as a prior public use creating a statutory bar to the validity of Steckel '195. R.S. § 4886 (29 Stat. 692).*

These mills were first put into use around 1909–1910. The exact year is unimportant, for it is certain that it was more than two years prior to Steckel's date of invention.

They were installed at the Hancock Avenue Plant of the American Tube & Stamping Co. in Bridgeport, Connecticut. Five stands were put in, four in what is known as a "Belgian Train" and the fifth as a single stand. In 1918 or 1919 three more of these mills were built, so that by 1920 Bridgeport had eight Keating cluster mills in operation.

The mill structure itself has been previously described, with each work roll nested between two backing rolls. The mill rolls were 7″ wide, and the diameters were 3″ for the work rolls and 5″ for the backing rolls.

The backing rolls were equipped with a form of bearing which has been called "pin", "needle", "quill" or "roller" in the course of this litigation. Whatever its label, the physical facts have remained the same. The bearing was composed of a series of rollers $5\frac{1}{8}$″ long, varying in diameter from $\frac{1}{4}$″ to $\frac{7}{16}$″. These rollers ran directly on the neck of the backing roll and were enclosed by a steel shell known as an outer race.

Different diameter rollers were not intended to be used at the same time, but rather as a set. As natural wear eroded the surface of the race in which they were enclosed the larger sizes were used.

Also included in the construction of the bearing were steel and bronze washers. These were used to take end thrust from the rolls, and are known as thrust washers. More will be said of them later.

It is the position of Cold Metal that this bearing was not an antifriction bearing in fact nor in its environment. If it was an antifriction bearing the Keating mills would be entitled to great weight as an anticipation of Steckel.

In its attempt to show that the Bridgeport bearings were not antifriction in fact Cold Metal relies upon the coefficient of friction factor.

The coefficient of friction for the Bridgeport bearings was calculated as .0089 by Bliss-Greer's expert witness and as .0129 by Cold Metal's expert.

Cold Metal contends that neither of these values is sufficiently low to qualify the Bridgeport bearings as antifriction in fact. Reliance is placed upon a definition of antifriction bearing found in a footnote to an article written in 1933.

"Anti-friction bearings as applied to roll necks are considered as constituting a class in which the coefficient of friction is less than some relatively low maximum value, perhaps a value of 0.007. Strength of Roll Necks by W. Trinks and J. H. Hitchcock"

It was also pointed out that the coefficient of a good modern antifriction bearing ranges from .0015 to .0035.

I cannot accept these figures as a basis upon which to invalidate the Bridgeport bearing as an antifriction bearing as of the time of its construction.

As previously stated, at the time of Steckel's invention antifriction bearing meant a roller bearing, and no evidence was offered proving that it meant a roller bearing with any given coefficient of friction. The definition relied upon was given in an article written over 20 years after the Bridgeport bearing was put into use. It is not a rigid standard—some

* 35 U.S.C.A. §§ 101, 102, 161.

relatively low maximum value, perhaps a value of 0.007—and Prof. Trinks admitted that it was intended as a general dividing line and not a precise breakoff. The definition is authoritative for the purpose of the article in which it was used.

The important question is whether Bridgeport was antifriction in relation to the sliding bearings of its day, not whether it measures up to today's standards. As an analogy, let us consider a 1910 automobile, and whether it was a "high speed" vehicle. In relation to, and defined by, the standards of 1933 it would not be. But, in comparison to the other forms of transportation available in 1910

it was. That is the way the Bridgeport bearings must be considered.

Cold Metal contends that the coefficient of friction for a 1910 sliding bearing was .01. It is their position that taking .0129 as the correct coefficient of friction for Bridgeport, it was not antifriction in fact.

This figure of .01 is derived from an article entitled "Roll Neck Bearings" published by the A.S.M.E. (1935). Examination of the table from which it is taken shows that it is the absolute minimum value given for a sliding bearing. The complete range of values is shown as:

Brass, bronze or babbitt
$\begin{cases} \text{with good lubrication } .01\text{—}.05 \\ \text{with fair lubrication } .05\text{—}.08 \\ \text{with poor lubrication } .08\text{—}.15 \end{cases}$

---

In relating the Bridgeport bearings to the sliding bearing it is manifestly unfair to choose either minimum or maximum values for the sliding bearing. We are not concerned with the very best or worst, but rather with that which one would expect to find in everyday operation—the average. The overall average coefficient of friction for sliding bearings based on Cold Metal's figures is .08. The median of the range with good lubrication is .03.

Accepting for the sake of argument Cold Metal's figure for the coefficient of Bridgeport, it is approximately ⅙ of the overall average for sliding bearings, and 2½ times smaller than the median value for the best sliding bearings. Of course, if the opinion of Bliss-Greer's expert is correct, then Bridgeport falls below any value set for the sliding bearing.

So far then, it has been developed that the Bridgeport bearing was in physical construction a roller bearing with friction developing qualities 600% less than the average sliding bearing. Here, it should be noted that Cold Metal's witness Wilson admitted on cross-examination that in principle the Bridgeport

bearing was a good bearing. Cf. Atlantic Works v. Brady, 1882, 17 Otto 192, 198, 107 U.S. 192, 27 L.Ed. 438.

The last obstacle put up by Cold Metal to this bearing as being antifriction in fact is that it is a cageless bearing. I find no merit in this contention, as the evidence discloses that a well constructed bearing is entitled to be considered as antifriction, be it cage type or cageless.

It is my conclusion that the bearings on the Bridgeport mills were in fact antifriction bearings.

If there was a deficiency in the Bridgeport bearings it was one of mechanics, and not of design.

The evidence shows that the Bridgeport bearings were a "homemade" job. The rolling elements were cut from lengths of drill rod in Bridgeport's own plant and the ends were handground to deburr them. This resulted in the production of squared ends on the rollers, whereas the preferable design is with a rounded end. As a result of the rollers being cut as they were, it was sometimes necessary to straighten them out. This was done by pounding them with a lead

hammer. It was further stated that the steel from which the rollers were cut was not as hard as that used by commercial bearing manufacturers.

Bearing in mind the teaching of the publications of the vital importance of precision in methods and materials in the manufacture of an adequate roller bearing, it is really remarkable that these bearings functioned as well as they did.

The claim that these bearings were not antifriction in their environment is based on the actual performance and production of the mills. Testimony was tendered that the mills produced strip that was buckled and riffled in gauges below .020, that strip below that gauge had to be finished on other mills, and that the rolls still heated. Evidence of certain tests made on the mills was shown in support of these claims.

The tests shown in this litigation were three in nature. One involved the actual rolling of steel, one is designated the "roll on roll" test, in which the mill was run with no strip in it and the work rolls in contact with each other under heavy compression and the third was for the purpose of measuring heating on the mill.

I find that the temperature tests are inconclusive in that they are incomplete. They were intended to compare the relative temperatures of the backing roll necks and bodies, and to show heating in the roll necks. In this regard, continuing readings were made on the roll body of only one of the four backing rolls, only one reading was made on a second roll, and no readings were taken on the other two backing roll bodies at all. Those values which were taken show that except for one highly questionable reading the roll necks were always cooler than the roll bodies. Further, after an initial temperature rise at the beginning of a rolling, the readings on the roll necks were relatively constant, although exhibiting some fluctuation but no steady rise.

The compressed roll on roll test, without the strip between the rolls, is pointed to by Cold Metal as proof that the Bridgeport bearings were no good. The reason for this is that the test concluded with the oil on one of the lower rolls catching fire.

I find that this test, and its dramatic finale, are unacceptable as proof of the utility, or lack thereof, of the Bridgeport mill as a commercially functioning mill. Cold Metal's own witnesses admitted that the conditions under which the tests were made were abnormal and did not represent everyday operating procedures. The mill rolls were deprived of their cooling water, the operator was not allowed to lubricate the bearings, and the pressures on the rolls were far in excess of those normally applied. All the test proved was that the mill did not stand up under the procedures agreed upon therefor. These procedures, as has been pointed out, far exceeded the normal operation of the mill.

As to the steel rolling tests, the same fact is true in regard to the conditions under which it was made. In considering a test in which reductions were taken from .060 to .020 in four passes on strip 5⅛" wide Cold Metal's witness Reynolds stated:

"Well, from experience the bearings would not hold up trying to make these reductions on that mill."

An important sidelight came from the roll on roll test.

Frank Pagliaro, the roller on these Bridgeport mills, testified that for years he had been of the opinion that the deficiency in the Bridgeport bearings lay in their inability to absorb end thrust.

End thrust is a pressure exerted sidewise by the rolls. It is caused by the rolls being improperly aligned, which in turn may result from the rolls being improperly ground. Excessive end thrust can cause heating at the roll necks if it is inadequately absorbed.

The Bridgeport mills, at the time of the roll on roll test, were equipped with

bronze and steel washers for the absorption of end thrust. Following the flash fire, Pagliaro observed a condition on these washers which he described as their being virtually welded to the end of the roll.

Subsequently, around 1932, several alterations were made in the bearings, but they were principally related to providing thrust rollers instead of washers. Thrust rollers are not shown on the patent drawings in the '016 application. Steckel, however, did later embody them in his mills.

The practice of making their own rollers was discontinued and better quality hardened steel rollers were thereafter purchased from a regular bearing manufacturer. This improved the mills' ability to take heavier rolling loads.

No changes were made in the principle of the bearing so far as its ability to take a rolling load was concerned. It continued as a cageless full complement bearing. In fact, it is still functioning in that same manner today on a full production basis for the Solar Steel Company.

After this change was made the mills' operation improved appreciably.

Pagliaro testified that end thrust was a considerable problem in the Bridgeport mills, in that the firm also made their own backing rolls and did a poor job of it. The rolls were often warped and the grinding on them didn't help matters much. This resulted in poor alignment of the rolls in the mill. The improved ability to absorb the end thrust generated by these rolls would be expected to improve the general performance of the mill, as it did.

The Bridgeport mills are also attacked on the ground that in order to roll below .020 annealing was necessary, very little finishing work was done on the mill, and strip below .020 was buckled and riffled.

The necessity for the anneal at .020 is of no consequence here, for Patent No. '195 is not directed to the elimination of annealing, and does not mention it at all.

The buckling and riffling below .020 and the failure to finish a strip on the cluster mills are inter-related. It is stated that the reason finishing work on strip under .020 was done on other mills was to remove the buckles and riffles produced by the cluster mills.

The buckling cannot be attributed to any bearing fault. The testimony established the fact that buckling results from overheating of the center of the work roll from its frictional contact with the strip, and is not the result of roll neck heating. In addition, Pagliaro testified that he purposely "crowned" his rolls to produce a slight buckle.

Riffling is a result of roll neck heating. Pagliaro testified that generally only one neck on a given roll would overheat. This would indicate that substantial cause of the roll neck heating was end thrust pressure, as a given roll exerts end thrust on one side of the mill only.

The extent to which these strip defects occurred is not agreed upon by the several witnesses.

The testimony of Charles Siegel is such that even Cold Metal's other witnesses disagreed with it and is not of much value.

Percy Farwell, for Cold Metal, indicated it was a regular occurrence and that commercial strip off the cluster mills was rare.

James T. Reynolds, for Cold Metal, admitted that commercial rolling was done on the cluster mills at .010, but said there were times the strip would show buckling and riffling and it would have to be finished elsewhere.

Pagliaro, for Bliss-Greer, said that good commercial strip of .010 could be finished on the cluster mills if the roller had the necessary patience. He, too, admitted to the presence of buckles and riffles. However, he partially attributed the fact that little rolling under .020 was done on the cluster mills to the winding reel in use. The reel had four deep notches cut into it. When the strip got under .020 it was thin enough that the winding pressure might cause it to crimp

into these notches, and spoil the entire coil. Hence, such a strip was finished on a mill with a solid reel. This notched reel was abandoned in the early 1930's in favor of a solid one.

In view of the conflicting testimony about the commercial utility of these mills, the cold statistical facts relating thereto are important.

They produced several thousand tons of steel a year which was sold to the public.

Eight years after they were first put into use the firm built three more of the same design.

After the entire Hancock Avenue Plant was shut down in the depression of the early twenties, the cluster mills were the first restored to operation when business picked up.

One of the mills is in commercial operation today almost fifty years later, with the same type full complement cageless pin bearing.

Even supposing that these mills were as poor as the most critical of the witnesses pictured them to be, where would the designer have learned how to correct them in 1923? Suppose he had been handed Steckel's original '016 application. What good would it have done him? It said to use roller bearings on the necks of the backing rolls. That was what he was already doing. Thus, it wouldn't have helped him at all.

On the other hand, suppose he listened to Frank Pagliaro's ideas about thrust bearings, and read the literature of the art stressing the importance of proper methods and materials. He then, in 1923, could have done what was done in 1932 or thereabouts, and obviated the problems facing him.

Steckel's own view point on the Bridgeport mills is in conformity with the facts previously set forth. In order to view his comments in their proper light a report written by Stephen Badlam of Pittsburgh, in 1927, must be considered.

Reporting on The Development of the Backing Roll Mill Badlam wrote:

"In 1913 Mr. Frank A. Wilmot secured patents covering certain features of this [Bridgeport cluster] mill * * * Patent No. 1,071,846 dated Sept. 2, 1913. This type of mill proved very successful and a total of nine mills were built between 1909 and 1919. * * * It is certain that the last eight mills were all equipped with roller bearings. * * *

 * * * * * *

"In 1909 roller bearings were applied to the backing rolls of the cluster type mill as mentioned above, and these were successful; bearings of this same type being in use in these mills today."

Steckel, in writing to Biggert, President of United, expressed himself thus:

"As to what was really done at Bridgeport during the past nineteen or twenty years, I found that Badlam's report was substantially true, and if this were all that would bear on the case, we would be in bad. However, I have been trying to account for the fact that neither you nor I ever learned anything, valuable or otherwise, from all this long history at Bridgeport, and the fact that you nor I nor any other engineer with any imagination ever benefited from it can now be explained in a manner that should well influence a Federal Judge to rule in our favor. Blenko strongly urged on me to get the facts as to just how much secrecy there was at Bridgeport up to the time when my own record started at Youngstown nearly six years ago. * * *

 * * * * * *

"Having myself been in the room where all these mills were run, I can satisfy Stebbins that the situation would meet his legal definition of secrecy to the last degree. Anything lacking in the argument of secrecy can well be made up by what the people at Bridgeport will testify as to the limits of their own imagina-

tion in improving on the performance of the small mills.

\* \* \* \* \* \*

"P. S. If the attorneys should find anything lacking in the sole argument of secrecy, they should feel encouraged by the fact that they put your claims through the Patent Office on the argument of 'commercial success.' It can readily be arranged to have Keating testify that he was not on the way toward 'commercial success' in the sense that your showing was used at the Patent Office."

In this litigation no claim that the Bridgeport mills were hidden from the public view was pressed with any vigor, and the facts fail to establish any such conclusion.

As to the testimony on the Bridgeport mills which Steckel hoped could be arranged, it was not forthcoming as Keating did not testify herein.[6] It is true that the Bridgeport mills were not a "success" in the sense that the United mills at Rome were, but they were a good steady producing mill.

With these considerations out of the way it takes one back to Steckel's original thesis—he is "in bad" on the '195 patent in light of the Bridgeport mills.

It is also asserted by Bliss-Greer that a 3-high mill of the Edgar T. Ward Co. is a complete anticipation of Steckel '195.

Although there was some testimony relating to that mill, it is insufficient to establish anything worthy of serious consideration.

The sale of the Rome mill and its use for commercial production and for experimental purposes in December, 1925 is urged as a statutory bar (two years) to the claims asserted in the amendment of May 28, 1928. It is the position of Bliss-Greer that there was no adequate disclosure for these claims in Steckel's original application. The decision of the Supreme Court in Muncie Gear Works, Inc. v. Outboard Marine & Mfg. Co., 1942, 315 U.S. 759, 768, 62 S.Ct. 865, 86 L.Ed. 1171 is relied upon.

The Patent Office ruled that there was adequate disclosure for the claims in the amendment in Steckel's original application and he was entitled to the filing date of June 30, 1923.

This point was also urged and rejected in the Republic case.[7] The defense is without merit.

This concludes the survey of the art relevant to Steckel '195. Its collective import can now be considered.

The publications of the prior art widely proclaimed the advantages to be derived from the use of roller bearings in a rolling mill. These are the same advantages enumerated in the '195 specifications as attributes of the Steckel invention, while in truth they are attributes of the bearing itself.

These same publications indicated that it was the inability of the bearing manufacturer to produce an adequate roller bearing that was holding back their adoption in high pressure mills.

The prior art patents of Wilmot and Kriwan taught the application of roller bearings, both as to roll necks and as a backing ring as Steckel first utilized them.

The Bridgeport-Keating cluster mills used roller bearings on their backing rolls. It is true that these mills had their deficiencies. A major source of the difficulty can be attributed to the inadequate thrust bearings and the homemade rollers and backing rolls with which they were originally equipped. On the overall picture, any shortcomings in the Bridgeport mills in the pre-Steckel era was one of mechanics and not of principle. cf. Atlantic Works v. Brady, supra.

I can find no invention in being the first person to get an adequate roller

6. In fact, it appears that Keating testified adversely to Steckel in other litigation.

7. Cold Metal Process Co. v. Republic Steel Corp., D.C., 123 F.Supp. 525, affirmed 6 Cir., 1956, 233 F.2d 828. The effect of that case on this litigation will be considered hereinafter.

bearing and do what was predicted, advocated, taught, and attempted for many years prior thereto, but which the prior workers had been unable to achieve with a high degree of precision because of mechanical drawbacks.

Counsel for Cold Metal has cited the case of Eibel Process Co. v. Minnesota and Ontario Paper Co., 1923, 261 U.S. 45, 43 S.Ct. 322, 67 L.Ed. 523 as authority for the sustaining of Patent No. '195. In that case the Supreme Court upheld the validity of an improvement patent on a paper making machine. The change in the machine under the patented process was slight, but resulted in a great increase in the operating speed and efficiency of the apparatus.

The opinion states:

"In administering the patent law, the court first looks into the art, to find what the real merit of the alleged discovery or invention is, and whether it has advanced the art substantially. If it has done so, then the court is liberal in its construction of the patent, to secure to the inventor the reward he deserves. If what he has done works only a slight step forward, and that which he says is a discovery is on the borderline between mere mechanical change and real invention, then his patent, if sustained, will be given a narrow scope, and infringement will be found only in approximate copies of the new device." 261 U.S. 45, 63, 43 S.Ct. 322, 328.

This is a sound principle of law, but the distinction of facts between the Eibel case and that at bar detracts from its value as authority.

In Eibel, the improvement was an original conception of the inventor. Here, the improvement was in the utilization of a well-known expedient.

In Eibel, the Supreme Court found that the prior art did not suggest the patented improvement. Here, the state of the art taken in conjunction with the prior publications, which the Supreme Court stated should be the first thing considered, shows that the idea of using roller bearings was old, but that the means had theretofore not been available to do so in a precise manner.

In Eibel it is said "The defendant's witnesses without exception refer to that disclosure as something that surprised and startled the paper-making trade." There was nothing startling about putting roller bearings on the backing roll necks of a 4-high mill.

The improvements in both the paper making machine and rolling mill resulted in increased speeds of operation. However, while the increased speed of the paper making machine was totally attributable to the new apparatus, the same cannot be said for the rolling mills.

Around the time of Steckel it was necessary to "hand mike" the strip to check on its accuracy to gauge. The roller would put his hand micrometer on the moving strip and move with it as he got his reading. This practice necessarily resulted in a limitation on the speeds at which the mill was run, in that it had to be kept low enough so that "hand miking" was possible.

On modern mills a "continuous gauge" is used. This is an automatic, or electronic, gauging device attached to the mill itself. This device checks the accuracy of gauge without any speed limitations. As fast as the mill will run, that is as fast as the "continuous gauge" will operate.

L. A. Beeghly, a witness for Cold Metal, admitted that the development of the continuous gauger brought about a substantial increase in the productivity of rolling mills. However, he felt unqualified to comment on a statement made by Steckel himself that the continuous gauger resulted in about a 40% increase in productivity. On the basis of Steckel's testimony it can only be safely said that the advent of the roller bearing mill itself accounted for about 60% of the modern mill's increased productivity.

Patent No. '195 has been sustained in prior litigation with great emphasis on

the commercial success of the mills based on its design.[8]

It is true that when the 4-high roller bearing mill was brought to fruition the old method of pack rolling was thereafter gradually abandoned. This is claimed to establish the commercial success of Steckel.

Rather impressive figures of monies collected by Cold Metal were also introduced to establish commercial success. In this regard, it is to be noted that approximately one-third of the total amount collected resulted from licenses and settlements executed on the eve of the expiration of the excess profits tax law. A substantial part of the remainder was collected from other steel companies under threat of suit or in settlement of suits already instituted. This is by no means as impressive as it would be if a willing buyer and seller had entered into the agreement. It is some evidence that the licensees preferred to make their peace rather than fight, and not too much can be judged from it. Ruben Condenser Co. v. Copeland Refrigeration Corp., 2 Cir., 1936, 85 F.2d 537, 540, certiorari denied 1937, 300 U.S. 665, 57 S.Ct. 508, 81 L.Ed. 873.

In addition, only 28 of the 52 licenses from which Cold Metal's wealth was accumulated included '195 as one of the patents licensed. Of those 28, in 13 Patent No. '195 was only one of 25 patents included in a package deal. Finally, although '195 was to expire after '016, those licenses entered into December 29, 1945 were only for the duration of the '016 patent, although '195 was also licensed in each case. In view of the foregoing, the fact that Cold Metal has collected over $32,000,000 cannot be considered a tribute to the validity of Steckel '195 alone.

In Deering Milliken Research Corp. v. Electric Furnace Corp., 6 Cir., 261 F.2d 619, 622 the Court of Appeals held that a combination for an automatic loom for weaving cloth which consisted of old elements with the addition of a new non-sticking patented material, called Teflon, applied to the grate of the loom to prevent the accumulation of lint did not involve invention.

Judge Simons said:

"Commercial success without invention will not make patentability. Great Atlantic & Pacific Tea Co. v. Supermarket Corp., 340 U.S. 147, 71 S.Ct. 127, 95 L.Ed. 162 * * *

"The specification of the patent fully discloses prior art and the specific nature of the improvements claimed. The publications relied upon by the appellee speak for themselves and no expert testimony can change their disclosure that Teflon is a non-sticking plastic, whatever its chemical formula may be. Its major characteristic is proclaimed by the publications and by the patent itself. Teflon was not the invention or discovery of Ingham. The problem before him was to eliminate the clogging of lint in the slotted grate. A plastic that would do away with much of such clogging was at hand. Its chief characteristic was proclaimed to the world. He added it to his combination. It is as simple as that. Even though we take note of the caution against underrating simple patents, what Ingham did was not 'invention.' "

This quotation is particularly applicable here because Steckel did not invent roller bearings. Their chief characteristics had been proclaimed to the world. Steckel added them to his combination. See also Cold Metal Products Co. v. Newport Steel Corp., 6 Cir., 1955, 226 F.2d 19, 22.

It is the way of our industrial civilization that as the new comes along the old is abandoned. Without such a procedure there would be no progress. But, that does not make every improvement invention, nor every device which makes its predecessor obsolete patentable.

8. Cold Metal Process Co. v. Carnegie-Illinois Steel Corp., 3 Cir., 1939, 108 F.2d 322.

While the Morgoil bearing issue might well have been discussed under the subject of infringement, since mills equipped with Morgoil bearings are charged to infringe '195 patent, I think it also is pertinent to the validity of the patent so I will consider it here.

The Morgoil bearing was not invented until 1932 (10 years after Steckel's conception in July, 1922). It was covered by patents owned by the Morgan Construction Company of Worcester, Massachusetts.

In essence, the Morgoil bearing is merely an improvement of the old brass or bronze sliding bearing which had been in use on all types of rolling mills long before Steckel. It depends upon the sliding action of two highly polished surfaces upon each other. The Morgoil bearing is fully enclosed. A film of oil is maintained under pressure between the bearing surfaces, which slide on the oil. This results in a low coefficient of friction comparable to that of the best roller bearings. The enclosure keeps out dirt, water and all foreign matter. The bearing will accommodate heavy loads at high speeds. It does not require the radial space of roller bearings.

The bearing is most efficient at high speeds which do not affect its life. This is not true of roller bearings.

In its catalogue describing the bearing, the Morgan Construction Company discussed the difficulties encountered by the rolling mill industry with bearings and related its research work on the subject and the reasons therefor stating:

"Realizing these difficulties, the Morgan Construction Company undertook some extensive research work to determine the ability of a correctly designed and proportioned, flood-lubricated, *plain bearing* to withstand the heavy rolling loads encountered in modern hot and cold rolling practice. From this research work was developed the Morgoil roll neck bearing. Hundreds of these bearings are now in operation on all types of hot and cold mills and their performance is exceeding our greatest expectations." (Emphasis added.)

Consideration of the Morgoil bearing emphasizes the invalidity of Steckel '195.

As mills equipped with Morgoil bearings are charged by Cold Metal as infringements of '195, they must be considered as achieving the same desirable results as the roller bearing mills of that patent.

The Morgoil bearing being in essence an improvement of the old plain sliding bearing it can be said that Cold Metal is claiming a valid patent on the ancient 4-high mill when its plain sliding bearing is improved by another inventor, as to reach a low coefficient of friction. No invention resides in taking the bearing of Morgan Construction Company and placing it on the backing roll necks of a 4-high mill.

If it was invention for Steckel to apply roller bearings to the necks of the backing rolls of a rolling mill (which roller bearing manufacturers had been advocating for a long time), I see no good reason why a patent could not be obtained for the use of Morgoil bearings in the same manner. This might be rough on Morgan Construction Company, which invented the bearings, for its patent would be useless if the invention could not be used for the purpose for which it was intended without paying tribute to another.

Nor can I see any valid reason why Steckel's conception should be extended to embrace all future inventions relating to improvements in bearings for rolling mills.

While it is my conclusion from all the evidence that Steckel Patent No. 1,779,-195 is invalid for lack of invention, I feel that I am bound to follow the Republic decision in this District.

In Cold Metal Process Company v. Republic Steel Corporation, Civil Action No. 21,390 in this Court, Republic was charged with infringement of Steckel Patent Nos. '016 and '195. District Judge Levin, sitting by designation,

reached a different conclusion from substantially the same evidence and held that Claims 3, 4, 6, 7, 8, 11 to 17 of Patent No. '195 were valid and infringed. He further held that Claims 11, 12, 21 to 26 of Patent No. '016 were valid and infringed.

The District Judge, however, denied recovery and dismissed the complaint on the ground that all of the accused mills had been purchased by Republic from United, an exclusive licensee of Cold Metal, and hence were immune from infringement. D.C.1954, 123 F.Supp. 525.

This judgment was affirmed by the Court of Appeals. 6 Cir., 1956, 233 F.2d 828.

Bliss and Greer contend that they were not parties to the Republic case and hence are not bound by the judgment which was rendered. This being true, the judgment in the Republic case was, of course, not res judicata as to them. The Court was, therefore, required to hear all the evidence in the case at bar and determine the issues independently on their merits.

Counsel for Bliss and Greer were requested by the Court to point out any difference in the evidence in the Republic case and the case at bar as it related to the validity of the patents. They were unable to point out any material difference. I, therefore, conclude that the evidence was substantially the same in both cases on this issue.

■ In this District, we have five District Judges but only one United States District Court. When the Court speaks through one of the Judges, the decision should be followed by his colleagues unless it is clearly wrong. It would not be conducive to the orderly administration of justice to do otherwise. This rule has been observed in the Southern District of New York, one of the largest in the country. Holmberg v. Anchell, 24 F.Supp. 594, affirmed Holmberg v. Merrick, 2 Cir., 1940, 110 F.2d 1022; Bartels v. Sperti, Inc., D.C.1947, 73 F. Supp. 751; United States v. Aluminum Co. of America, D.C.1941, 2 F.R.D. 224;

Brusselback v. Cago Corp., D.C.1938, 24 F.Supp. 524; 21 C.J.S. Courts § 196 (1940). It is particularly important that the rule be followed in a patent case as it involves property rights.

■ The decision of the Court of Appeals of this Circuit rests on firmer ground than comity. The District Court is bound by it. Bishop & Babcock Mfg. Co. v. Sears Roebuck Co., 125 F.Supp. 528, 531 affirmed 6 Cir., 1956, 232 F.2d 116; Swan Carburetor Co. v. Chrysler Corp., D.C., 34 F.Supp. 766, 767, affirmed 6 Cir., 1942, 130 F.2d 391; 21 C.J. S. Courts § 198 (1940).

It should be observed, however, that although the patents were held valid and infringed in Republic, no recovery was permitted and the complaint was dismissed because of the defendant's immunity afforded by the purchase of the mills from an exclusive licensee.

Since Republic was not the licensee it had the right to and did challenge the validity of the patents when it was charged with infringement. The issue of validity was, therefore, properly before the Court in that case.

The validity of Patent No. '195 as determined by the Court of Appeals in Republic was necessarily based on some of the conclusions of the District Court which are different from those adopted here. The Court of Appeals stated:

"This record shows that roller bearings had not been used before on 4-high mills. The use of roller bearings of such strength as to cope with the extremely high pressures involved in these operations, speeded up to multiples of the former attainable speeds, was not made possible until *Steckel by his new structure* afforded sufficient space in the combination for roller bearings of increased size and strength." (Empasis added) 233 F.2d 828, 838.

It has been tacitly admitted here by Cold Metal, and I feel is firmly established by the record in this case, that Steckel's mill stand itself had no new proportions. The patented mill is the

same basic 4-high mill as had been known in the art for years. The only difference is that it had an improved bearing on the necks of the backing rolls.

In my judgment, the thing that made possible the use of roller bearings was the evolution of the bearing itself. The space had always been available on the conventionally proportioned 4-high mill, but the adequate bearing had not been developed. Steckel, perhaps, was the first with the mechanical aptitude and the initiative to utilize the roller bearing in this fashion, but in so doing he was only exercising mechanical skill and not invention. When he was done, the roller bearing was doing what it traditionally did—allowing higher rolling speeds with less power and less roll heating. The only difference was in the location at which it was performing its time honored function. This location had always been available and had been waiting for the bearing to be built which could take advantage of its being put therein.

Furthermore, I feel that on this record it has been established that roller bearings had in fact been used on the Bridgeport 4-high cluster mills.

■ Notwithstanding, in conformity to Republic, I hold Patent No. '195 to be a valid patent.

### Patent No. '016.

This patent was issued directly on Steckel's original application filed June 30, 1923 and is confined to cold rolling. It applies to any backed up mill (3-high, 4-high or cluster) embodying its features. It discloses small work rolls and large backing rolls. The backing rolls are mounted on roller bearings. The mill is driven entirely, principally, largely or substantially by pulling on the strip. This feature, namely, operation of the mill wholly or in part by tension on the strip distinguishes it from Patent No. '195.

All of the elements comprising the combination were admittedly old. It is the combination of old elements which it is claimed produces a new and useful result not obvious to those skilled in the art and involves invention.

The patent states in the first paragraph:

"This invention relates to metal rolling and is particularly valuable for cold rolling metal into thin strip form. It also relates to a new cold process for making economically thin sheet metal hitherto made by hot rolling in packs, notably commercial tin plate, * * *"

It describes the prior practice of annealing:

"In cold rolling as heretofore practiced it has been generally considered necessary to anneal the material after it has been reduced to half its original thickness, and as a consequence great reductions by cold rolling have always required a large number of intermediate anneals."

It states how the mill and the process permits the avoidance of intermediate annealing:

"The roll pressures necessary for elongation are sufficiently low so that the strip is not hardened to require re-annealing. The antifriction backing for the small rolls allows the necessary tension to be maintained on the strip to keep the strip straight but without tearing it. The strip may also be rolled at a high speed since the roll pressures permit of high speed anti-friction mountings for the backing rolls."

The patent further states:

" * * * I use a roll, or preferably a pair of rolls, of comparatively small diameter. These rolls do not have the necessary strength to be self supporting, and are therefore provided with backing rolls of large diameter and of the necessary strength to withstand the rolling pressure. The backing rolls have an anti-friction mounting.

 * * * * * *

"The reducing rolls 3 are smaller than would be required to withstand the spreading force due to rolling,

and are supported by larger backing rolls 5 having anti-friction mounting.

\* \* \* \* \* \*

"By reducing the diameter of the rolls operating on the strip, and thereby lessening the necessary roll pressure, I can provide an anti-friction backing for the small rolls which permits the rolls to be driven largely, if not entirely by the tension on the delivered strip.

\* \* \* \* \* \*

"While a certain amount of power may be supplied to the rolls, it is desirable that a large part of the work be done by pulling on the strip itself, since this insures rolling the product straight, and accurate gauge."

Cold Metal contends that the essential teaching of the patent is:

"The essential teaching of this patent is the combination of slender work rolls, which are too small in diameter relative to their length to be self-supporting, with much larger and rigid backing rolls having anti-friction bearings, and the use of tension for supplying a substantial part of the force required for the rolling, the large backing rolls making possible the use of slender work rolls and anti-friction bearings. As is pointed out in the patent, by using the relatively small work rolls, the roll pressures are reduced and anti-friction bearings can be used on the backing rolls and, where such bearings are used, the rolls may be driven substantially, largely, or even entirely, by tension on the strip, thus providing both tensile and compressive forces at the point of reduction."

The claims in suit are 2, 3, 4, 7 to 12 inclusive and 24 to 26.

The meaning of the terms "relatively small" as applied to the size of the working rolls and "substantial" as defining a degree of tension, which appear in the claims, is in dispute.

Cold Metal has taken the position that "relatively small" means that the working rolls are small in relation to the size of the backing up rolls, and is not related to any definite diameter.

Bliss and Greer contend that this term should be construed as meaning a small roll per se, and does not concern any working roll-backing roll relationship.

It is my conclusion that "relatively small" as used in the patent means a work roll of six inches or less, and does not encompass a larger working roll which is small in relation to its backing roll. This conclusion is founded on consideration of Cold Metal's assertions to the Patent Office and testimony received in this trial.

The patent itself states in several places that small work rolls are used in order to eliminate the process of intermediate annealing in rolling to thinner gauges. This was the function assigned to them by Steckel.

In a response filed to an action of the Patent Office in the prosecution of '016 Steckel stated:

"We are faced with the necessity of defining a meritorious invention in general terms because of the wide variation in character of the metal being treated. So far as we are aware, applicant is the first to discover that if a work roll is made so very small, the material can be cold rolled many times without intermediate annealing \* \* \* Any one reading applicant's specifications will know how to secure the advantages of the invention and he will certainly know if he is infringing."

In answer to a later action Steckel again repeated:

"We must again ask reconsideration of Claims 20 and 21. It is true that they do not define the roll diameter. The specification does give the roll size \* \* \*"

Thus, Steckel is telling the Patent Office that anyone can tell whether he is infringing by reading the patent specifications.

The specifications state:

"The reducing rolls are much smaller than those commonly employed in rolling mill practice, and should for ordinary work be less than six inches in diameter, preferably from two to four inches."

The term "ordinary work" is not defined and is also in dispute. Cold Metal claims it relates to the width of the material to be rolled, which at the time of Steckel's invention was of a maximum of approximately 20 inches.

I think that, in using this term, Steckel was referring to the nature of the work to be done on the mill which his patent disclosed, and that it was meant to cover the cold rolling of low carbon steel. The rolling of low carbon steel is the ordinary task of one of these reducing mills, in contrast to the rolling of high carbon or a specialty alloy steel.

This is in accord with a statement made by Steckel in a speech to a group of rolling mill engineers in 1932:

"The 2 inch and 3 inch diameter rolls are small enough to obviate intermediate annealing in rolling the hardest metals [High carbon and alloy steels], practically from any gauge down to any other desired gauge, without an intermediate anneal. This cannot be said of the five inch diameter rolls, which, however, enable the rolling of low carbon steel to any desired degree of reduction, as in tin plate production, without intermediate annealing."

In the prosecution of Patent No. '017, in discussing this feature of work roll size Steckel said:

"But he [Wilmot] did not know that if the rolls were made small enough there would be no necessity for intermediate annealing. Wilmot never produced applicant's product and never appreciated the advantage of small rolls which was discovered for the first time in the art by applicant."

Allowance of some of the '016 claims was obtained in the prosecution of '018 application. The claims were transferred by amendment after allowance. Therein the following assertions appear:

"The successive reductions are carried on without intermediate annealing and this is made possible by the use of small rolls.

"Applicant was the first to discover the critical effect of roll size on continued rolling and we submit that applicant is entitled to Claims 8 and 9 in order to protect this discovery."

Thus, it appears that during the entire prosecution of the patents the position was taken that small work rolls themselves, not work rolls small in relation to their backing rolls, were the important feature, and that the proper size of the work rolls was to be found in the specifications. The specifications limit the maximum size of the work roll to six inches.

There is a further reason why the size of the work rolls must be limited. In order to obtain the benefit claimed in Patent '016 the elimination of intermediate annealing, a work roll small per se must be used.

The patent states:

"In cold rolling as heretofore practiced it has been generally considered necessary to anneal the material after it has been reduced to half its original thickness, and as a consequence great reductions by cold rolling have always required a large number of intermediate anneals. In order to prevent such hardening of the strip with the accompanying annealing, I use a roll, or preferably a pair of rolls, of comparatively small diameter."

It should be pointed out that while it is true that the use of small work rolls enables reductions to thinner gauges without the necessity for intermediate annealing, the assertion in the patent that the material hardens less is not true.

Dr. Polakowski, a Cold Metal witness, testified that in general the thinner the gauge desired the smaller the diameter

of work roll necessary to roll to that gauge. The reason for this lies in the nature of the art of steel reducing.

The use of the very small work roll is like using a sharp tool which permits better cutting. The arc of contact between the small work roll and the strip is much less than with a large work roll. This permits the concentration of pressure over a smaller area of the strip. This concentration of pressure results in a greater "bite". The greater "bite" the lower in range of reduction a strip can go before it gets to a point where it is so hardened that it will resist any further reductions. It is for this reason that a small roll will reduce a piece of metal of a given hardness when a large roll, with a much greater arc of contact and resulting duller "bite", will not.

Therefore, in order to have the ability to bite into the strip over such a range of hardness that reductions may be taken down to tin plate gauge without intermediate annealing it is necessary to have a work roll small per se. It is for this reason that the term "relatively small" as describing a work roll in the Steckel claims must be limited to the range of the specifications, with a maximum diameter of six inches.

The other term in the claims to be construed is "substantially", as used in Claims 11 and 12 which recite that the mill is arranged so that it may be driven substantially by tension on the strip.

The remainder of the claims in suit relate to driving the mill either "principally" or "largely" by tension on the strip.

The first time a claim for driving a mill substantially by tension on the strip was presented to the Patent Office was in 1929, six years after the '016 application had been filed. Up to that time the prosecution had been proceeding on the basis that the mill sought to be patented was to have the majority, if not all, of its power supplied by tension on the strip.

In adding the "substantially claims" Steckel stated to the Patent Office:

"New Claims 51 and 52 differ from Claims 39 to 41 in reciting that a *substantial* part of the power instead of the *principal* power is supplied by tension. This was discussed at the interview and it is thought that the new claims are allowable. Obviously no one should be permitted to use the substance of applicant's invention but assert that the power supplied was say only 49% of the total. Applicant is the first to produce the three feature combination of small rolls, anti-friction backing, and tension. While in most cases most if not all of the power will be supplied by tension on the strip, we have deemed it proper to add these two claims as a precautionary measure."

It is my conclusion that these claims should be limited to the range attributed to them by the inventor, and only extend slightly under the point where tension is supplying 50% of the total power. If Steckel had desired to claim the entire field of tension in his combination, he should have so stated. I find it doubtful, in light of the prior art, that the claims would have been allowed had that been the position taken. The word substantial does not connote small or meager. It would include the high range of principally or entirely. In view of the evidence in the file wrapper, I am not willing to extend it below 49%.

It has been shown that any mill employing a tension reel for winding and keeping the strip taut is inevitably driven to some extent by the tension on the strip. The prior art is replete with patents teaching the use of varying degrees of tension on the strip in conjunction with rolling mills. See Lauth, No. 29,702 (1860); Tilghman, Br. No. 9382 (1886); Conklin, No. 823,765 (1906); Lauber et al., Br. No. 20,455 (1911); Clark, No. 1,108,971 (1914); Webster, No. 1,109,885 (1914); Clark, No. 1,145,-880 (1915); Coryell, No. 1,618,515 (1927, application filed 1921).

The claims of the foregoing patents are in many instances quite expansive

in teaching the use of tension in the rolling mill art. For example:

Coryell 1,618,515

"Claim (1) The method of working a ferrous metal piece, which includes the operations of pressing the piece between rolls applying a force approaching the elastic limit of the metal, and simultaneously drawing out the advancing portion of the piece beyond the rolls with a tensional force approaching the elastic limit of the metal."

Lauber et al. Br. 20,455

"Claim (1) The hereinbefore described process for the manufacture of aluminum foil in the form of strips or lengths of a thickness less than 0.02 millimetres, according to which the aluminum is treated in a rolling machine while only a slight amount of roll pressure is applied, a strong tractile force being simultaneously exerted on the aluminum."

If, as Coryell teaches, sufficient tension is applied to approach the elastic limit of the strip, it seems obvious that this would contribute substantially to the operation of the mill. Not much more tension could be utilized without breaking the strip.

None of these patents explicitly teach the use of tension on the strip as the main source of motive power for the mill. That, therefore, was the area open for Steckel to claim as his invention. In order that Claims 11 and 12 be valid they must be restricted to operation in the range not less than 49% of the total power. In my judgment, these claims would be invalid if construed to embrace substantial tension which was clearly revealed in the prior art.

■ Considering Steckel '016 as a patent on a 4-high rolling mill with roller bearings on the backing rolls, work rolls of six inches or less, and having approximately 49% or more of its motive power supplied by tension on the strip I find it to be a valid combination patent. Gibson-Stewart Co., Inc. v. Wm. Bros. Boiler and Mfg. Co., 6 Cir., 264 F.2d 776.

I find that in this new combination the various elements co-acting with one another permit rolling to gauges of about .010 without the necessity of intermediate annealing. This is made possible by the use of the work roll small per se and tension on the strip as the main source of motive power, which elements allow the use of lesser screw pressures in taking a given reduction than would be necessary on a conventional mill using large work rolls and minimal tension on the strip.

I find that tension on the strip performs a new function, providing the principal source of motive power in a mill in which the work rolls are also powered.

I further find that the roller bearings in this combination have the additional function of making posssible the utilization of tension on the strip as the principal drive, in addition to performing the traditional functions of increasing speed and decreasing roll heating and the driving power required.

■ As a whole, I find that the claims in question all embody old elements, but that the old elements perform new functions and produce a new and different result. This satisfies the requisites for a valid combination patent. Expanded Metal Co. v. Bradford, 1909, 214 U.S. 366, 29 S.Ct. 652, 53 L.Ed. 1034; Egry Register Co. v. Standard Register Co., 6 Cir., 1920, 267 F. 186.

Patent No. '016 was held valid in Republic.

### Infringement

■ The issue involves a mixed question of fact and law. The burden of proof is upon Cold Metal.

It is necessary to construe the patents and to make a comparison of the accused mills with the inventions disclosed in Patent Nos. '016 and '195.

Twenty-one mills charged to infringe the Steckel patents were selected by the parties to be the subject of proofs at the trial. They are described in OX-2, Items 1–21, pp. 2 and 3. Proofs were offered on all except Items 17 and 20

which were withdrawn at the trial. Proof was also offered on a single stand one way mill purchased by Greer from United in 1928 which is charged to have infringed '195 patent which I will refer to as Item 22.

Four of the mills (Items 1, 2, 11, 13) have Morgoil bearings on the necks of the backing rolls and are charged to infringe Patents '195 and '016.

 I have previously discussed the Morgoil bearing issue in treating on the validity of '195 and what was said there need not be repeated here. A mill equipped with Morgoil bearings lacks one of the essential elements of Steckel's combination, namely, roller bearings. As has been pointed out a Morgoil bearing is not a roller bearing and operates on an entirely different principle, namely, on a film of oil maintained under pressure between the moving parts in the bearing enclosure. I, therefore, find that mills equipped with Morgoil bearings do not infringe either Patent No. '016 or '195.

Seven of the remaining mills (Items 4, 14, 16, 18, 19, 21, 22) are charged to infringe Patent No. '195 alone.

With respect to these mills, the issue is simple. Having held that '195 is valid, it is only necessary to determine whether the backing roll necks were mounted with roller bearings. I find that they were so mounted and hence they infringe Patent No. '195. This includes the mill purchased by Greer from United (Item 22).

Two of the mills (Items 14 and 15) are cluster mills, one at Alcoa, Tennessee and the other at Springdale, Connecticut.

While Cold Metal has pointed out a distinction between a cluster mill and a 4-high mill in discussing the issue of validity, I believe it is a distinction without a difference. The principle remains the same. The cluster mills with roller bearings on the backing rolls which provide vertical as well as horizontal support for the working rolls infringe '195 patent.

Only one mill (Item 12) is charged with infringing Patent No. '016 alone.

The remaining mills (Items 3, 5, 6, 7, 8, 9, 10, 15) have roller bearings on their backing roll necks and are charged to infringe Patent Nos. '016 and '195. For Items 8, 9 and 10 Bliss is charged with infringing both patents, while Greer is charged with infringement of '195 alone.

Only four of the mills charged to infringe '016 (Items 3, 5, 6, 12) have work rolls of 6″ or under.

I have found that mills with working rolls of more than 6″ in diameter go beyond Steckel's conception in '016. This is true not only with respect to the patent specification, but also with respect to the representations he made to the Patent Office as disclosed in the file wrapper. Indeed, it goes beyond the essence of his invention which was the use of small work rolls backed up by large backing rolls mounted on roller bearings whereby the strip could be rolled to a thin gauge without intermediate annealing. Therefore, the mills with working rolls over 6″ in diameter do not infringe Patent No. '016. This eliminates Items 7, 8, 9, 10 and 15 from consideration on infringement of '016.

The question remains if Items 3, 5, 6 and 12 respond to the patent claims as being driven substantially, principally, largely or entirely by tension on the strip.

On his redirect examination, Lloyd Wilson of Cold Metal was questioned about the operation of several mills (OX-2, pp. 2–3, Items 3, 5, 6, 12 and 7, 8, 9, 10, 11, 15). The ratio of rated capacity of mill motor to reel motor for those mills ranges from 2.5–1 to 8–1.

In each instance, he testified that it would be a normal and practical operation to operate the mill with more power on the reel motor than on the mill motor.

On recross, it was developed that if the mills were so operated the reduction effected would be so slight that the mill would be operating as a finishing, rather than reducing mill.

Wilson further admitted, after considerable hedging on the question of what is the most normal operation of a mill, that:

"Generally the [mill] motor would be used at something below its greatest power and something above its minimum power, some average, perhaps halfway between, two-thirds between or one-fourth of it, and that the reel * * * is more apt to be running at the top 25% of its ability. In that case, then I would say those are normal operations."

Thus, it was admitted by Cold Metal's witness that in the most normal operation of the reducing mills he testified about, on the basis of the rated motor capacities set forth in OX-2, they would all operate with over 50% of the power being supplied by the mill motor. Further, the operation wherein over 50% of the power would come from tension on the strip, which he said would be normal and practical, would be a finishing rather than reducing pass.

Figures of actual tension readings taken by Cold Metal on some of the accused mills corroborate the theory that in normal operation less than 50% of the power comes from the tension on the delivered strip.

The Superior Steel single stand reversing cold mills (OX-2, pp. 2–3, Items 1 and 2) have mill motors of 1,000 h.p. and reel motors of 200 h.p., for a 5–1 ratio. Readings taken on mill 40B (Item 2) showed a range of tension from 15.3% to 44.4%. Of thirty readings taken, most fell below 25% tension power.

Readings on the final stand of the five stand tandem of Greer Steel at Anderson, Indiana (OX-2, pp. 2–3, Item 11) were also introduced. The mill motor was 250 h.p. and the reel motor 100 h.p. for a ratio of 2.5–1.

In 63 readings there was a range of from 12% to 44.7% with only one reading of 51.5% which I regard as aberrant. Most of the readings ranged between 15 and 35%. Seventeen of the readings were under 20%, while only seven exceeded 40%. All of the readings, except the aberrant one, are well under Steckel's conception.

Alcoa's A and B Tandem mills (OX-2, pp. 2–3, Item 13) were also tested. The ratio of mill-reel motors for these mills was 8–1.

On the A Tandem mill, readings were obtained on Stand 1 ranging from 39.2% to 60.8%. On Stand 2 the range was only from 5.1% to 9.2%.

The operation of this mill does not respond to any of the claims of '016 covering continuous mills. Said claims require that all the stands of a tandem mill be powered at least substantially by tension on the strip. The tension values for Stand No. 2 fall far below this.

On the B Tandem mill Stand No. 1, the range was from 14.3% to 30.9% and on Stand No. 2 from 7.1% to 11.2%. In no instance did these mills, in their normal operation, reach a point where over 50% of the power was by tension on the strip.

It was claimed by Cold Metal that a tandem mill can be operated so that the last stand and its preceding stand can be driven principally by tension on the strip at the same time. While this may theoretically be possible in practice it would not generally work out. If attempted on the Greer 3-stand tandem, the motor on the last stand would have to be operating at less than one-fourth of its capacity in order that that final stand be driven by tension generated by the reel. If the mill was so operating it is doubtful whether sufficient power would be left to provide enough tension between the last stand and its predecessor so as to drive the preceding stand principally by tension. There would certainly not be enough power in such an operation to provide for reduction in the metal. The operation might be used for planishing, but this could be accomplished on the old 2-high mill with plain or roller bearings which was certainly not Steckel's concept.

■ A device designed to be used in a manner which will not infringe is not of an infringing character merely be-

cause it is capable of infringing by use in another manner which is more difficult and without object or advantage. 69 C.J.S. Patents § 291 (1951).

It would be without object or advantage to use a 4-high reducing mill for finishing work when an ordinary plain bearing 2-high mill, which is less complex and costly, is adequate for the job. There was no evidence that the infringing mills were in fact operated by the user as temper mills.

Therefore, I find that Patent No. '016 is infringed only by those mills manufactured by Bliss which are so powered that in the course of normal operations would have 49% or more of the total power supplied by tension on the strip.

Of all the mills listed in OX-2 as infringements of the Steckel patents, not having Morgoil bearings, only the following have work rolls 6 inches or under so they may be considered as possible infringements of Patent No. '016:

Item 16, p. 12–13 also listed as Item 5, p. 2–3

Item 17, p. 12–13 also listed as Item 6, p. 2–3

Item 21, p. 14–15 also listed as Item 12, p. 2–3

Item 26, p. 14–15 not charged to infringe '016

Item 37, p. 14–15 also listed as Item 3, p. 2–3

Item 40, p. 16–17

The ratios of mill motor rated capacity to reel motor rated capacity for these mills are:

| | |
|---|---|
| Item 16 | 3.33–1 |
| Item 17 | |
| Item 21 | 4–1 |
| Item 37 | 6–1 |
| Item 40 | 6.25–1 |

On the basis of these figures I find that of the five mills none were manufactured by the E. W. Bliss Co., so as to operate in a normal manner which would infringe Steckel '016.

In fact, none of the mills in OX-2, other than Greer at Anderson, charged with infringement of the Steckel patents shows a ratio of mill to reel motor power under 3.33–1. This is for all the mills tabulated, notwithstanding the work roll size.

I, therefore, conclude that none of the mills were manufactured by Bliss so as to infringe Steckel '016.

License Defense

Two questions are involved in this defense: (1) whether the mill purchased by Greer from United, which I found to infringe '195 patent, acquired immunity by reason of the exclusive license granted by Cold Metal to United and (2) whether United was an indispensable party to Cold Metal's counterclaim for infringement, requiring dismissal of the counterclaim for failure to join United as a party defendant thereto.

As indicated before, the Biggert and Johnson application for patent and Steckel's application for patent were both pending in the Patent Office at the same time and were being handled by the same firm of patent attorneys, although by different members of the firm.

Biggert and Johnson application disclosed a 4-high mill with roller bearings on the necks of the backing rolls.

Steckel's original '016 application (filed previous to Biggert and Johnson) contained three claims directed to the same disclosure. The Patent Office rejected these claims for lack of invention and they were cancelled from Steckel's application on April 6, 1926. He then filed new claims with tension features.

The law firm handling the applications discovered there was a conflict of interest and arranged for a meeting of the two clients without revealing to either what was in the application of the other.

The result of the meeting was that a license agreement was entered into on June 20, 1927, between Cold Metal and United. The law firm, with the consent of both parties, was to continue to represent both of them in the prosecution of the separate applications.

It was agreed to press for allowance the "common subject matter" claims [9] in the Biggert and Johnson application instead of in Steckel's because United had achieved commercial success in the sale of the Rome and other mills while Steckel's operations had been small. It was felt this would make for a better showing in the Patent Office, and it apparently did.

On December 27, 1927, Biggert and Johnson Patent No. '235 issued. Shortly thereafter all of the claims of the Biggert and Johnson patent except one were copied in Steckel's '016 application and a request for an interference was made. The Patent Office declared an interference and the claims were awarded to Steckel by default. A division was required by the Patent Office and the common subject matter claims were cancelled from '016 application and embodied in a divisional application filed by Steckel.

Steckel then pointed out to the Patent Office that its previous holding in '016 patent proceedings that there was no invention in the application of roller bearings to the necks of the backing rolls was inconsistent with its holding in the Biggert and Johnson proceeding that such claims were allowable. He requested allowance. This was granted and '195 patent issued to Cold Metal on October 21, 1930.

(1) The Greer mill

Under date of November 8, 1928, United made a written proposal to Greer to sell it the infringing mill. The price of the mill was $12,800 and $4,700 for the winding reel. The proposal stated:

> "The mill upon which this proposal is made is covered by U. S. Patent No. 1,654,235 which is owned by us, and purchase of a mill from us includes license for its use under said patent."

This proposal was accepted in writing by Greer on November 9, 1928, and became a binding contract. Delivery of the mill was made shortly thereafter.

Cold Metal claims that the mill was not covered by the license because it was sold before Patent No. '195 issued and the license did not become operative until then. It also asserts that in litigation over the license between United and Cold Metal, it was held by the Master hearing the case that mills sold before Patent No. '195 was issued were not covered by the license.

When Greer purchased the mill on November 9, 1928, United was the owner of Patent No. '235. United also had rights under the agreement dated June 20, 1927.

In effect, the license agreement made it possible for the attorneys to prosecute Steckel's rejected claims to a successful conclusion in the Biggert and Johnson application. In that application resort was made to the commercial success of United in selling the Rome mill and other mills. The Patent Office was obviously impressed thereby and issued to Biggert and Johnson the patent under which the sale to Greer was made, the claims for which were later awarded to Steckel by default in the interference proceedings.

Cold Metal having made it possible, by the agreement of June 20, 1927, and the course of procedure followed under it, for United to obtain Patent No. '235 and to make the sale and license to Greer thereunder, it would not seem equitable and just for Cold Metal to compel Greer to pay twice for its license.

On plain principles of equity, (a patent infringement action is an equity case), Cold Metal is estopped from asserting its claim against Greer for infringement by the use of the mill purchased from United.

(2) Was United an Indispensable Party?

Bliss and Greer contend that United acquired an exclusive license under Patent No. '195 by the agreement of June 20, 1927, tantamount to an assignment and, therefore, was an indispensable party to the counterclaim for infringement. It is claimed that since United was not

---

9. The common subject matter claims were those which related solely to a 4-high mill with roller bearings on the backing roll necks.

joined as a party thereto, the counterclaim in so far as it charges infringement of '195 should be dismissed.

Cold Metal points out that Bliss could have made United a party to the original complaint, but failed to do so and ought new to be heard complaining about Cold Metal's failure to join United to the counterclaim.

The complaint for declaratory judgment became moot upon the expiration of the patents. It is, therefore, not necessary to determine whether Bliss should have joined United as a party thereto.

■ If United was an indispensable party to the counterclaim for infringement, failure to join it as a party would require dismissal under Rule 12(b) of the Federal Rules of Civil Procedure, 28 U.S.C.A. This defense may be raised at any time. Rule 12(h).

A determination of this question requires consideration of the rights granted United under the license. Resort should also be made to the surrounding facts and circumstances for whatever light they may shed on the intention of the parties.

The license agreement has been held valid and enforceable in extensive litigation between United and Cold Metal.

In Cold Metal Process Co. v. United Engineering & Foundry Co., D.C.W.D. Pa.1933, 3 F.Supp. 120, appeal dismissed 3 Cir., 1934, 68 F.2d 564, United was charged with infringing the '195 patent. The court held the license agreement of June 20, 1927, was a valid and subsisting contract which granted United immunity from a claim of infringement. In Republic, United's customers were granted immunity from infringement. 6 Cir., 1956, 233 F.2d 828.

In a suit by Cold Metal against United for rescission of the agreement or for specific performance, the court denied rescission, but granted specific performance and ordered an accounting. The court held that there was valuable consideration for the agreement; that it was not illegal; that it had been partly performed; that neither party could be restored to its former position; that the court would leave the parties where it finds them and enforce the contract. 3 Cir., 1939, 107 F.2d 27.

In the accounting proceedings, it was determined that the parties had agreed upon a royalty rate, which the Master applied, finding in favor of Cold Metal for $387,650.00. The judgment of the District Court confirming the Master's report was affirmed by the Court of Appeals. 3 Cir., 1956, 235 F.2d 224.

The scope of the license granted is set forth in the third paragraph of the contract. It reads:

* * * Cold Metal shall grant to United a license to make, use and sell rolling mills under such [common] claim or claims, which license shall be exclusive to United for 4-high hot mills and for 4-high cold mills in which the major portion of the power required by a roll stand is supplied to the rolls directly and not through tension exerted on the material for pulling it through the rolls; Cold Metal, however, reserving the right to make or have made for its own use and to use in its own plant or plants such hot and cold mills, and provided further that Cold Metal shall have the right to make, use and sell or to license others to make, use and sell such 4-high hot mills in combination with means for coiling the rolled strip between passes as described in the pending application of A. P. Steckel, Serial No. 198,915, filed June 15, 1927.

Application Serial No. 198,915 matured into Patent No. 1,857,670. This patent contains three claims only, all of them being method claims for the working of hot strip. The claims do not specify the mill upon which the method is to be carried out, other than it is to be operated as a reversing mill. Only one of the claims requires that the strip be maintained under tension, and the degree of tension is not specified.

■ In order that a patent licensee be an indispensable party to an action

for infringement brought by the patentee, the license must endow the licensee with rights tantamount to an assignment of the patent. Waterman v. MacKenzie, 1890, 138 U.S. 252, 11 S.Ct. 334, 34 L.Ed. 923.

In this instance United did not receive such a bundle of rights. Cold Metal reserved to itself the right to make, use and sell the mill which it was licensing to United, so long as it was used in accordance with the method Patent No. 1,857,670. The fact that Cold Metal could only exercise this right in a limited manner does not alter the fact that in so far as the manufacture of the basic mill stand itself (which was all that was licensed to United) was concerned, Cold Metal had co-existent rights with United for the manufacture, use and sale. Therefore, United did not stand in the shoes of the patentee in that it could not exercise sole dominion over the patented mill. That being so, United is not an indispensable party to the counterclaim.

### Damages.

Disposition of the indispensable party defense does not end the question of the effect of the license agreement on this litigation.

In the field of cold mills where the major power was applied directly to the rolls, United's license was exclusive, with Cold Metal having only a shop right with respect to such mills.

As to mills where tension on the strip supplied the major or principal source of power, Cold Metal retained the sole right to make, use and sell such mills.

In substance and effect, what the parties did was to divide the field of tension, one taking the lower and the other the upper 50% of it.

In essence, what Steckel was doing by this license was protecting his '016 patent tension claims. Having given United an exclusive license on the basic mill structure, it was necessary to place this limitation on it. If United had not been restricted to the mill in conjunction with less than 50% tension the '016 patent would have been rendered sterile in Steckel's hands. He would have been unable to publicly sell the mill structure without encroaching on United's license. United would have had the right to use up to 50% tension with its licensed mill in any event, that range not being in Steckel's domain under the '016 tension claims.

As the end result of this license United was in effect the one who could exercise full dominion over any cold mills coming under the '195 patent. The reason this is true is that the '195 patent relates to only the basic mill structure itself, and is not concerned with tensions. Therefore, United had the sole right to make, use and sell to the public the basic mill structure itself, which is all Patent No. '195 covered. It was restricted only in that it could not combine the mill structure with a tensioning device which would result in the majority of the power coming from tension on the strip.

The only interest Cold Metal had in this basic mill stand on which United held the exclusive license was the right to collect royalties for its manufacture, use or sale.

On the basis of the foregoing it can be said that in the case of a cold mill which infringes Patent No. '195 alone, Cold Metal's monetary interest in such a mill is limited to the stipulated royalty. To allow Cold Metal to recover for infringements in United's field in excess of the royalty would be inconsistent with the rights granted to Cold Metal under the license agreement.

Looking at the actualities of this case, if United had sold the mills involved here, Cold Metal could have collected from it only the royalty to which it was entitled. It could not maintain an action for infringement against United's customers, as was held in Republic. If Cold Metal were permitted to collect in excess of the stipulated royalty it could be held to account to United for such sum.

All the mills found to infringe herein fall squarely within United's license, in

that they are cold mills infringing Patent No. '195 only.

While United could collect from Cold Metal if Cold Metal were allowed full recovery, United would at this time have no right to maintain an action for infringement on its own accord. This is because any such claim on the part of United against Bliss would be barred by the Statute of Limitations.

United's exclusive license expired with the death of the Steckel patents in 1947. Any rights it might have had to assert a claim of infringement against Bliss for manufacturing a mill under the '195 patent expired in 1953 with the running of the Statute of Limitations. The reason that Cold Metal's counterclaim was not barred by the Statute of Limitations was that the filing of the original declaratory judgment action by Bliss tolled the Statute. United was not a party to that action and hence the Statute ran against it.

If Cold Metal was allowed to recover over the royalty rate it would produce one of two results:

(1) In the event that United took no action to recover the excess, Cold Metal would be unjustly enriched.

(2) In the event that United did sue Cold Metal to recover that which was rightly theirs another lawsuit in this seemingly interminable litigation would ensue. It is the duty of the Courts to discourage multiplicity of suits and unending litigation, not open the door for it. United has not been diligent in enforcing any rights it was possessed of in this matter. It is not up to the Court to protect the rights of those who with full knowledge of the facts choose not to look after themselves. To give United an opportunity to collect damages in this case would be to bestow upon it a gratuity in reward for its negligence. Such is not the proper course to follow.

▆▆▆ Accordingly, I shall limit Cold Metal's damages to the stipulated royalty.

Judge Learned Hand was faced with a similar problem in Marks Music Corp. v. Jerry Vogel Music Co., 2 Cir., 1944, 140 F.2d 268. Therein two authors of a song had originally obtained a copyright, but the renewal was taken by only one of the two. The one who had renewed the copyright brought an infringement action in his own name without joining his co-author. Judge Hand allowed recovery, but limited the plaintiff's damages to his share of the property right. While the facts are somewhat different here, I believe the principle is applicable.

Cold Metal's damages being limited in this manner, Greer is absolved from any liability.

Cold Metal is only entitled to collect one royalty per mill. This royalty is most properly collected from Bliss, rather than from Greer.

▆▆▆ Once the actual construction of a patented mill itself is completed liability attaches to the mill builder if another holds the patent. In the event that the builder is the licensee of the patent holder said liability is the duty to pay a royalty. When such a builder sells the mill to a user, the user acquires immunity from any claims on the part of the patent holder, without the necessity of further payment unless stipulated for.

In this case, although the builder is not in fact a licensee Cold Metal is limited in its damages as though the builder was its licensee. Therefore, Cold Metal being entitled to collect from Bliss for the manufacture of the mills sold to Greer, it is not entitled to collect from Greer a second time.

### Unclean Hands.

▆▆▆ Bliss and Greer claim improper conduct in the handling of the Biggert and Johnson and Steckel applications for patent in the Patent Office. In substance, it is asserted that Biggert and Johnson were held out as the inventors of mills which previously had been in-

vented by Steckel and disclosed in his patent application.

It was not controverted that neither Biggert and Johnson nor Steckel knew what was in the application of the other. They could not very well be charged with fraud.

This and other grounds were relied upon by the Government in its suit filed in this Court to cancel the patents on the ground of fraud.

Judge Shackelford Miller, Jr., sitting in this Court by designation, decided against the Government and held there was no fraud. His judgment was affirmed by the Court of Appeals. United States v. Cold Metal Process Co., D.C., 62 F.Supp. 127, affirmed 6 Cir., 1947, 164 F.2d 754. It is binding here. I therefore, reject this defense.

## Lockwood Patent No. '422

█ This patent was applied for in 1947, the year in which the Steckel patents expired.

Lockwood had been in the employ of Cold Metal since 1928, and became Vice President and General Manager of the Company. He was President of its successor, the Cold Metal Products Company. He is now President of the Youngstown Research and Development Company, the present owner of the patent. He has worked for over forty years in the steel rolling industry in varying positions, chiefly in sales and management.

The Lockwood patent is a method patent containing nine claims relating to the rolling of metal in strip form. Example claims are copied in the footnote.[10]

10. "1. The method of cold reducing metal in strip form in a mill of the 4-high type having a pair of work rolls and a backing roll for each work roll, the work rolls and the backing rolls being arranged in frictional engagement with each other and in alignment with their longitudinal axes in substantially the same vertical plane, which comprises the steps of passing the strip back and forth between the work rolls to effect a substantial reduction in the thickness of the strip, applying a forward tension on the delivered strip of sufficient magnitude to supply a substantial portion of the power required to move the metal between the rolls and reduce it in thickness, and at the same time positively driving the backing rolls and thereby driving the work rolls by the frictional engagement between the backing rolls and the work rolls to thereby supply a substantial part of the power required to reduce and deliver the strip.

"4. The method of cold reducing metal in strip form in a mill of the 4-high type having a pair of work rolls, each of which is too small to be self-supporting, and a single backing roll for each work roll in frictional engagement therewith, which comprises passing the strip back and forth between the work rolls to effect a substantial reduction in the thickness of the strip by applying a forward tension on the delivered strip and at the same time driving the backing rolls directly and the work rolls indirectly through the frictional engagement between the backing rolls and the work rolls, the forward tension on the delivered strip being of suffi-

cient magnitude to supply approximately 20% to 70% of the total amount of power applied to the rolls.

"8. The method of cold reducing metal in strip form in a mill of the 4-high type having a pair of work rolls and a single backing roll for each work roll in frictional engagement therewith, which comprises positioning the strip between the work rolls and driving the work rolls entirely by frictional forces exerted on said rolls by applying a substantial forward tension on the delivered strip and by positively driving the backing rolls, which, in turn, drive the work rolls by the frictional engagement therebetween, a substantial portion of the power required for reducing and delivering the strip being supplied by the forward tension on the strip and a substantial portion being supplied through the frictional driving of the work rolls by the backing rolls.

"9. The method of cold reducing metal in strip form in a mill of the 4-high type having a pair of work rolls and a single backing roll for each work roll in frictional engagement therewith, which comprises positioning the strip between the work rolls and driving the work rolls entirely by frictional forces exerted on said rolls by applying a substantial forward tension on the delivered strip and by positively driving the backing rolls, which, in turn, drive the work rolls by the frictional engagement therebetween, the power for reducing and delivering the strip supplied through tension being approximately 20% to 70% of that supplied through the driving of the backing rolls."

While it is a method patent, it actually covers an apparatus, namely, a 4-high mill with small work rolls and relatively large backing rolls, the latter being driven. The reason this is so is due to the breadth of the claims.

The method claimed for this patent is the use of tension in varying degrees in a process to be carried out on the above-mentioned mill. The tension called for is defined both broadly and specifically. The broad claims call for the use of appreciable or substantial tension. The specific claims call for tension in the order of: 50% of the power required to reduce and deliver the strip; 20 to 70% of the total power applied to the rolls; 20 to 70% of the power supplied through the driving of the backing rolls.

Webster's Twentieth Century dictionary defines appreciable as "capable of being duly estimated, perceptible". It would, therefore, include the lowest value next to zero. Since high tension is also appreciable, and certainly substantial, the Lockwood claims could be construed as extending the tension values from 0 to 100%.

This being true, it would be impossible to operate a driven backing roll mill with small work rolls and relatively large backing rolls with any tension without infringing upon some of the Lockwood claims. Therefore, Lockwood is in essence a patent covering this mill with tension, although couched in terms of a method.

It was conceded that if certain of the mills charged to infringe Steckel '016 had driven backing rolls instead of driven working rolls, they would embody Lockwood's concept. Bliss claims that Lockwood is a Steckel mill with driven backing rolls, lacks invention and is anticipated by the prior art.

In support of the claim of invention for Lockwood many advantages and accomplishments were set forth:

1. A mill employing the Lockwood process readily produces gauges which cannot be produced practically and economically on a mill with driven work rolls.

2. Smaller work rolls can be used since no torque is transmitted through the work roll necks. Also, greater power can be supplied to a mill of a given size without danger of roll neck damage.

3. Greater reductions can be taken on a mill employing the Lockwood invention. Also, the number of passes required to make a given reduction is less.

4. The separating force for a given reduction is less in a mill employing the Lockwood method. Thus, smaller bearings and lighter housings may be used.

5. Tension can be utilized in a mill employing the Lockwood method to control the shape of the strip.

6. The quality of the product rolled on a mill employing the Lockwood invention is superior. Flat strip having a uniform gauge can be produced with greater facility.

7. Operation expenses are less for a mill employing the Lockwood method.

8. A range of work roll diameters may be used in the same mill.

9. Critical roll matching is eliminated. This saves grinding time and grinding losses and permits smaller roll inventories.

10. Tungsten carbide rolls can be used in a mill employing the Lockwood invention whereas they are not practical in a mill in which the work rolls are driven. The carbide rolls aid in controlling gauge and shape of the strip. They wear longer, produce a higher finish, and set up less stresses in the mill.

11. The work rolls of a mill employing the Lockwood invention can be changed easier.

12. The bearings on a mill utilizing the Lockwood method have a longer useful life.

The fallacy in this argument is that virtually all of the foregoing advantages are attributes of the backing roll drive mill per se, and not of the use of the Lockwood method on the backing roll drive mill.

Any backing roll drive mill permits the use of smaller work rolls than a mill with driven work rolls. A very small work roll cannot withstand extremely heavy torque requirements and would tend to break at the neck in a work roll drive mill. No torque being transmitted through the neck of the work roll in the backing roll drive mill, this situation does not exist. This feature of the mill itself is enumerated as advantage No. 2 for the Lockwood method.

Advantages Nos. 1, 3, 4, 6, 7 and 12 are all derivative of the ability to use a smaller work roll. They are, therefore, not properly considered as an advantage of the Lockwood method.

The testimony established that advantages Nos. 8, 9, 10 and 11 were each a feature of the driven backing roll mill itself also.

This leaves only advantage No. 5, the ability to use tension to control the shape of the strip, as a result of the Lockwood method. On the basis of the conflicting testimony of Mort and Wingard, it is highly questionable if this feature actually exists.

It should be observed that when Lockwood outlined the advantages of his mill to the Patent Office his patent had both mill claims and method claims. The mill claims were cancelled by Lockwood and the patent issued only on method claims. He still claims all the advantages of the mill itself.

Bliss asserts that the tension claimed by Lockwood is substantially the same as employed in normal operations of mills with driven work rolls; that the various ranges specified in the patent are not critical and are old in the art.

If this is so, it goes to the heart of the validity of this patent. The driven backing roll mill itself is old in the art [Chartener Patent No. 1,522,473 (1922); Steckel Patent No. 1,857,670 (1927); Montgomery Patent No. 2,072,122 (1937); Steckel Patent No. 1,744,017 (1930); Montgomery Patent No. 2,214,-107 (1940)],[11] although it was not shown to have been used to any great extent. If all the Lockwood method is is the use of conventional tension in conjunction with an old mill, invention would certainly be lacking.

Doctor Sachs, Cold Metal's expert witness, admitted:

"Q. * * * isn't it true that if you had gone all over the country and looked at all the conventional mills that almost 100% of the rollings you would have seen on them involved tensions of which the same thing would have been true, namely, that the tension would have been supplying between 20 and 70% of the total forward power? A. That is correct."

Lockwood himself testified, on deposition, to the following:

"Q. Isn't it so, Mr. Lockwood, that speaking generally with reference to the 4-high mills, conventional 4-high mills, as operated prior to 1945, that their winding reel motors ran generally between 20 and 70% of the power of the mill motors themselves? A. Offhand, I don't think of any higher than about 50%; that seems to be a very favorite selection for the power.

"Q. And they ran from 50% all the way down to 20% and below in the same sense that they do in your mill? A. There might have been some that low. Some would have about a third of the power; there might have been some that had more than 50% but I don't recall any although there may have been."

The import of this testimony is that if a mill user had a backing roll drive mill built in accordance with the prior art and operated it with the degree of ten-

11. Cold Metal was the assignee of the Steckel and Montgomery patents.

sion he was accustomed to using on his working roll drive mills, he would be employing the Lockwood method.

Lockwood experienced difficulty in the Patent Office. All of the claims in his application were rejected by the Examiner as lacking in invention. He appealed to the Board of Appeals, which reversed the Examiner and allowed the claims.

In the initial action of the Patent Office, all of the claims of Lockwood's original application were rejected for three reasons.

1. They defined no invention over McBain 2,157,739 in view of Steckel 1,857,670.

McBain '739 disclosed a reversible mill equipped with winding and unwinding reels on opposite sides of the rolls and powered by motors for the purpose of maintaining and regulating tension on the strip.

Steckel '670 was a 4-high reversible hot mill. The patent stated:

"Either the working rolls or the backing up rolls may be driven as desired."

Claim No. 2 of the patent provided for maintaining the strip under tension.

Both Steckel and McBain were affiliated with Cold Metal and had assigned their patents to it.

What the Examiner was saying was that it involved no invention for Lockwood to combine Steckel's patented mill with McBain's patented tension features, as this was certainly obvious to him as well as to anyone else skilled in the art.

2. The Examiner pointed out that Sendzimir 2,169,711 taught that it was old to combine tension with rolling. The claims were rejected as defining no invention over Steckel '670 in view of Sendzimir.

3. They defined no invention over Steckel '018 in view of Steckel '670 or Chartener 1,522,473.

Chartener Patent No. '473, like Steckel '670, taught that it was old to drive the backing rolls. Steckel '018, the Examiner pointed out, disclosed adjustable means for driving both the winding and unwinding reels and that there was no invention in operating the reels so as to provide tension on the strip in view of Sendzimir.

The Examiner might also have mentioned that in view of Steckel '016 (which has previously been considered), it was old to drive a 4-high work roll driven mill substantially, largely, principally or entirely by tension on the strip.

A reconsideration was sought, but the Examiner adhered to his ruling.

Lockwood then cancelled Claims 1 to 14 inclusive and substituted new Claims 15 to 21. Affidavits of Lockwood, Charles Schultz and Lloyd L. Wilson, all Cold Metal associates, were submitted.

The affidavit of Wilson had attached to it an article which he had written for Iron Age concerning Lockwood's mill.

It was claimed that the work rolls were operated by frictional forces working in opposite directions thereby balancing the forces and eliminating roll bowing; that there was no suggestion of such a combination of forces in the prior art.

The Examiner was not impressed. He stated that the advantages claimed were inherent in backing roll driven mills; that the balancing of forces was a matter of mechanical skill of the roller. He also came up with a new reference—Klein et al. Patent No. 2,287,380, which counsel for Lockwood admits is close.

Klein disclosed a 4-high temper mill with driven backing rolls and tension on the strip.

The specifications of Klein provided:

"The work rolls are driven by any conventional means, such as an electric motor, which may be connected by suitable means to the work rolls or the backing rolls or one alone of the backing rolls may be driven. * * * The peripheral speed of the rolls is slightly greater than the peripheral speed of the work rolls, so that a desired amount of tension is exerted on the strip between the rolls * * *."

The unwinding reel was equipped with a conventional motor generator set "to

impose a controlled drag or tension on the strip." The winding reel was also driven by an electric motor.

An electric tensionmeter was provided between the stands to control the current to the motors driving the mill and the reels so that the *desired* amount of tension and power applied to the rolls could be maintained constantly as the operator wished.

The Examiner rejected all of the claims as being unpatentable over Klein.

He also adhered to this previous ruling that they were unpatentable over McBain '739 in view of Steckel '670.

Lockwood then filed an amendment cancelling all of his claims and adding nine new ones. They included the specific tension values of 50% of the power required to reduce and deliver the strip and 20 to 70% of the power applied to the rolls, or of that supplied through the driving of the backing rolls.

The new claims were drawn in an attempt to avoid Klein Patent No. '380. They were directed solely to reducing metal, whereas previously they covered strip rolling in general which would have included temper passing as well as reduction.

An effort was made to distinguish Klein '380, McBain '739 and Steckel '670.

It was urged that the Klein mill was only a one way mill, namely, a 2-stand tandem, while Lockwood is a single stand reversible mill in which the material is passed back and forth in one mill. This, it seems to me, has no bearing on the issue.

Lockwood's claims were not on a mill, but on a method. Mills using Lockwood's method could anticipate or infringe it whether such mills were single stand, reversible or tandem.

It was further claimed that Klein was a temper mill designed to take light reductions and involving the use of a small amount of tension.

The tempering or finishing of the strip is usually the last step in the reducing operation after the substantial reductions have been taken.

Light reductions of the metal are made in tempering operations, which Klein describes as being from 1 to 10%. In effecting such reductions, according to the witness Wilson, it was customary to lighten the screw pressure and use more tension in relation to the overall powering than was used for reducing. In temper operations, there is less compression and more tension on the strip. There is not the overall amount of tension and compression, however, as is employed in heavy reductions. The difference is one of degree. This was well known to anyone skilled in the art.

Lockwood and Klein operate on the same principle, namely, driven backing rolls and tension on the strip. As before stated, the difference is only one of degree.

Lockwood himself attested to this fact in his deposition:

"Q. Now, you have said that temper rolling doesn't require as much power as reduction rolling. Is there any difference in the distribution of power as between the power as applied as tension and the power applied directly to the rolls, between what you call temper rolling and what you call reduction rolling? A. There could be a difference or it could be the same. We generally try to make its power according to the particular ideas of the owners of the mill in making the installation."

While Lockwood's mill is for reducing and Klein's for tempering the only difference in their mode of operation is in the total amount of power being supplied to the system. If adequate power were to be supplied to Klein to operate the mill as a reducing mill, the Lockwood method would be produced. The Examiner could see no invention in this. Invention, it seems to me also, does not reside in increasing the total powering of an existing mill.

Steckel '670 was distinguished before the Examiner on the ground that it was a hot mill, whereas Lockwood's mill is a cold mill. It was claimed that Steckel

could not use heavy tension on hot steel without breaking the strip.

The fact is that Steckel's '670 patent provided:

"Each coiler is motor driven and may be operated at such a rate as to maintain the delivered strip under tension."

Claim 2 states:

" * * * and maintaining the metal under tension between the rolling thereof and the coiling thereof."

While it may be true, as Cold Metal contends, that the tension in hot rolling is not as heavy as in cold rolling (and for this reason Steckel may not anticipate Lockwood), the Examiner was right when he in effect said that it does not involve invention for Lockwood to adopt Steckel's principle of driven backing rolls with tension and apply it to cold rolling with the degree of tension customarily employed in that field.

Invention cannot rest here in the use of a patented mill for a little different operation.

McBain '739 was distinguished by Lockwood on the ground that although he showed substantially the same features for regulating tension as did Lockwood, yet McBain drove the working rolls and not the backing rolls of his mill. This does not vitiate its effect on the question of invention in combination with a patent for backing roll drive.

The Examiner concluded that there was no invention in applying McBain's tension features to Steckel's '670 mill. He finally rejected all claims in the application.

The Board of Appeals rejected the Klein patent as a reference because it felt that the tension values were of a relatively low order as compared with Lockwood.

The Board stated that there was "no disclosure in Klein et al. that the amount of tension exerted on the strip 10 is sufficient to supply a substantial portion of the power required to move the metal between the rolls and reduce it in thickness as called for in some of the claims or is of the order of 20 to 70% of the power supplied to the work rolls."

Granting that this is true, as previously stated, it would not be much of an invention for Lockwood to take Klein's mill and increase his power values, thereby producing enough power in the tension reel so as to respond to the Lockwood claims.

While the tension values employed in a temper mill are not of the magnitude of the reducing mill, they are by no means low.

Bliss' witness Wingard testified to the tension values which would be incident to the normal operation of a temper mill built in accordance with the Klein patent. They are as follows:

10,000 p.s.i.[12] between the entry reel and tension bridle

13,000 to 14,000 p.s.i. between the bridle and the mill stand

18,000 to 22,000 p.s.i. between Stand 1 and 2

18,000 to 25,000 p.s.i. between delivery side of Stand 2 and bridle

9,000 to 10,000 p.s.i. between tension bridle and winding reel.

The winding tension is usually light to avoid marking or indentation of the strip occasioned by the winding equipment. This was recognized in the Klein patent.

Temper mills do not normally operate at capacity and, therefore, are actually capable of producing much higher tension values than are indicated herein.

The range of reductions specified in the Klein patent extends up to 10%. This is not far from the normal reduction of 15% effected on the Steckel all-pull mill. In normal operations, reductions up to 35% are taken on the Lockwood mill, starting sometimes at 25%.

Lockwood's method was intended to be used principally in the rolling of thin

---

12. p.s.i. means pounds per square inch. As used here, it is the amount of tension in pounds exerted on a square inch of strip being pulled.

strip. A 25% reduction on strip .008 would mean taking off .002 inches. A temper pass, on the Klein mill, of 5% on strip .030 thick would result in .0015 reduction in the strip. Thus, although the percentage of reduction taken on the temper pass is much smaller, the actual reduction could be nearly the same.

To me, there is no substantial difference in principle between Lockwood and Klein. Lockwood would limit Klein to 10% reductions and carry out the same concept in reductions in excess thereof. If it can be said that there is invention in taking Klein's mill and increasing the power so as to effect larger reductions, then Lockwood's method patent is valid, otherwise it is not.

Bliss claims that Lockwood is anticipated by the mills of the Athenia Steel Co. (now Athenia Steel Division of National Standard Co.).

Since about 1929 Athenia has had in operation in its plant in Clifton, New Jersey, several 4-high mills with driven backing rolls and equipped with tension reels. The tension reels were originally driven by a belt from the main mill drive, slippage of the belt being relied upon to compensate for the difference in the speed of the reel at different stages of the coil build-up. Around 1946, this was changed to a belt with a friction clutch interposed in the reel drive.

There is no dispute that the Athenia mills themselves respond to the description of the mills upon which the Lockwood method is to be carried out. The only point open to question is what tensions were used on those mills prior to Lockwood's date of conception.

In this regard, the depositions of the rollers who operated the mills during the period in question, were offered to establish the degree of tension they used. Also, on August 6, 1958, instrumented tests were run on those mills by Bliss and the results tabulated.

The utility of the test results is attacked on two grounds. First, it is said that because the tests were run after the change was made from the slipping belt to the friction clutch reel drive they are not probative of the tensions existing prior to Lockwood's date of invention. Second, the results of the tests are charged to be so filled with errors as to be untrustworthy.

On this first point, the testimony of Frans Person, one of the rollers, is highly illuminating. He testified that after the new clutches were installed the degree of tension could be adjusted with more precision (OX-47, p. 107), but that the amounts of tension used were the same as with the slipping belt (OX-47, p. 110). The testimony of his fellow roller, Bertil Olson, is in accord with Person's views as to the similarity of the tensions used with the belt and friction clutch drives (OX-47, p. 254). Therefore, I feel that the results of the tests were competent on the question of tensions prior to Lockwood.

The tests were made using equipment supplied by Cold Metal for the measuring of mill horsepower and a tensionmeter supplied by Bliss (developed by the Reliance Electric Co. of Cleveland, Ohio) for the measuring of tension in the strip. The tensionmeter was positioned between the mill and reel, and the issuing strip run in contact with it. Personnel from both sides participated in the reading of the various metering devices.

The first set of figures compiled by Bliss based on the test readings showed a range of tensions from approximately 11 to 75%.

It was then brought out by Cold Metal that in reaching these figures a motor efficiency at variance with the actual efficiency of the Athenia mill motors was used.

A second set of figures was then submitted by Bliss taking into account what was contended to be the correct motor efficiency value. This set of figures showed an approximate range of tensions from 12 to over 100%. Bliss' expert, Wingard, explained that where the calculations showed over 100% of the power necessary to run the mill being supplied by the tension reel that the reel was generating power. By this it is meant that the tension reel was developing more than enough power to oper-

ate the mill rolls and consequently was feeding the excess power back through the system. This phenomenon occurs when the tension reel runs faster than the spindle driving the mill rolls.

These calculations were attacked as not having taken into account the friction clutch losses. Cold Metal's expert, Dr. Sachs, after reviewing these figures stated that in his opinion they should be rejected because they were inaccurate.

Bliss thereafter submitted another set of calculations, taking into account all that the opposition had said produced the claimed inaccuracies. This set of figures showed a range of tension from about 15 to over 100% again.

It was then shown that in this final set of figures there were some values that were impossible, while others were admittedly inaccurate. Due to this Cold Metal contends that the Athenia test data should be discarded. This I feel cannot be done. Although the calculations are not entirely accurate, this was attributed by Bliss to the fact that the tensionmeter was so sensitive that it recorded the minutest variations in tension due to any factor, and that the readings which were taken off the tapes were of such small values that a minute error in reading the tapes could produce the results complained of. I find this to be substantially correct.

Even deducting the greatest degree of error claimed to exist in the calculations, an overage of 40%, a range of tension from approximately 9 to 143%, is reached for the final set of figures. This covers the scope of the Lockwood claims, except for no definite showing of a 50–50 ratio (Claim 7). That claim, however, not representing a critical dividing line must be considered to be covered by the general showing of the wide range of tensions produced by the Athenia mills.

On the overall picture, the Athenia tests show that the mills utilized a full range of tensions extending through that claimed as the Lockwood method. The fact that the calculations were not entirely accurate does not alter this general picture of the Athenia operations.

The testimony of the Athenia rollers substantiates the results of the tests.

Bertil Olson testified that when the reels were driven by the slipping belt it was possible to vary the tension from light to heavy by adjusting the belt's tightness or changing its size or length (OX-47, pp. 253, 296). In this regard, Frans Person indicated that it was his feeling that the belts pulled either too hard or too loose and that fine adjustments over the full range of tension were hard to achieve (OX-47, p. 108). This, however, indicates that the mills were capable of exerting varying tensions.

The stratagem by which Cold Metal attempted to vitiate the rollers' testimony was by asking them if they had only intended to use enough tension to wind the strip. In most instances, it got a simple "yes" answer to this question.

The detailed testimony of the rollers rebuts this attempted inference that the tension used at Athenia was minimal.

Person (OX-47, p. 42), Olson (OX-47, p. 250) and Carl Anderson (OX-47, p. 271) all testified that on occasion the tension was strong enough to tear the strip.

Person (OX-47, pp. 43, 101) and Anderson (OX-47, p. 276) both stated that the tension was sufficient to help pull buckles and riffles out of the strip.

Perhaps most important is the fact that although the rollers stated that it was their intention to use only enough tension to get a "nice coil", they also said that the degree of tension necessary to achieve that would vary with the thickness of the material being rolled. Thus, for thin strip a slight tension, whereas for the heavier gauges the amount of tension exerted on the strip would be increased (OX-47, pp. 153, 297, 299). Here then would be the variation of tension from light to heavy called for by Lockwood.

It is my conclusion, from all the evidence, that the operation of the Athenia

mills was carried out over a full range of tensions covering and anticipating the Lockwood method.

A mill of the General Electric Company situated at Cleveland, Ohio is also relied upon as a statutory bar on account of its being in public use for more than two years. It was manufactured by Standard Machinery Company and installed at the Cleveland Wire Plant of General Electric in 1919.

It was a small 4-high driven backing roll mill with sliding bearings. The diameter of the work rolls was 2⅜" and the backing rolls was 8". The roll faces were 8" in width. The mill was operated by a 10 h.p. electric motor which drove the backing rolls by a gear arrangement. A winding reel was operated from the same motor by a 2" belt and pulley. The work rolls were driven by their frictional contact with the backing rolls. The speed of the mill varied from 7 to 65 feet per minute.

Originally there was an additional belt on the pinion stand side of the mill housing which went around the work rolls and was intended to assist in their operation. General Electric found that the additional belt was of negligible value and it was discontinued in January, 1945 in order to make room on both sides of the mill for thrust bearings.

The General Electric records, which were received in evidence, indicate that the mill was purchased on September 30, 1919. The exact date is not important as the mill was shown to have been in continuous operation producing a commercially marketable product as far back as 1929 which was long prior to Lockwood's conception.

The mill was used by General Electric to roll molybdenum and tungsten sheets in width of 1½" to 3½" from .030 to .010, .005 and .001. The product of the mill was sold to the electrical trade and among other things was used in the manufacture of radio and television sets. About 80 to 90% of the production was of the gauge of .005 and thicker, but this was on account of customers orders therefor.

No measurements were ever made of the amount of tension exerted on the strip by the winding reel.

The roller Staiduhar testified that in normal operation the strip was very taut; that the mill was equipped with a lever arm and weights to apply tension; that they always wanted as much tension as they could get even to the extent where the belt would either tear or disintegrate; that in rolling to the thinner gauges below .005 the strip would sometimes break.

Lockwood claims that General Electric was a small mill with "baby" work rolls whereas his mill is large.

The method claims of the Lockwood patent are not directed to a mill of any particular size or to speed. A small mill as well as a large one would infringe Lockwood if the features of his patent were adopted, and it would make no difference whether the mill was operated fast or slow.

It was further claimed that the General Electric mill does not employ tensions of the magnitude of Lockwood and will not accomplish the same reductions without annealing.

It is true that General Electric did not employ tension of the magnitude of Lockwood. It was a small mill. The winding reel of General Electric was operated from the same 10 h.p. motor which drove the backing rolls. But General Electric certainly did employ enough tension to be appreciable and this would fall within the scope of Claim 2 of Lockwood's patent. If more power were applied to the winding reel, the mill would operate so that the tension would fall within the scope of all of Lockwood's claims. With the application of more power, intermediate annealing could be eliminated.

This mill had bearing trouble (as did the Bridgeport mill) which was remedied by thrust bearings.[13] A wider belt was

13. Lockwood does not cover bearings in his method patent so that is not a matter of concern here.

used to provide more tension. The result has been a better product.

General Electric mill at least anticipates Claim 2 of Lockwood because it is a 4-high driven back roll mill with appreciable tension.

A mill of the Universal Cyclops Co., converted by Bliss from a 3-high to a backing roll drive 4-high in 1939, is also relied upon as an anticipatory public use. The proofs in regard to the tensions used on that mill are not sufficient to justify a finding of any anticipation.

Likewise, there was a failure of proof on the mills of the Edgar T. Ward Co. and the SKF "Ring" mill of the Newman-Crosby Co. The amounts of tension used on those 3-high mills were not satisfactorily established.

The Sendzimir mill was a super cluster mill with small work rolls supported vertically and horizontally by intermediate rolls. This mill can use very small work rolls. Some in actual use are about the size of a broom stick. Metal can be rolled to very thin gauges, even thinner than Lockwood.

Bliss claims Lockwood is anticipated by (a) the Sendzimir patent and (b) prior publications relating thereto.

(a) The Patent.

"Sendzimir Patent No. 2,169,711 was issued August 15, 1939 on an application filed July 16, 1935. It provided for tension in combination with small work rolls, supported by intermediate backing rolls of the cluster type."

There is a dispute between the parties as to whether the patent provided for driving the intermediate backing rolls or the work rolls. In some of the early Sendzimir mills the work rolls were driven. This was true with respect to the Signode mill in Chicago.

The specifications of the patent provided:

"So far as the broad process aspect of my invention is concerned, there is no particular necessity for using a mill of any given type, or pulling devices of any given type, or drives intermediate the same of any given type. (p. 2, col. 2, 1.66)"

The patent then states as an embodiment of a device suitable for his practice a mill wherein:

"The working rolls 24, 25 are to be driven and the thrust upon them is transmitted by a pair of idler rolls 26, 27, two for each working roll, to backing up devices in the form of a series of shafts with rollers upon them, generally indicated at 28. * * *

" * * * As to the mill, I have indicated that the working rolls 24 and 25 which are the rolls driven, as explained, in connection with Figs. 3, 4 and 5 are backed by rolls 26 and 27."

Lockwood argued before the Patent Office that the Sendzimir patent provided for driven work rolls.

Bliss contends that the idler rolls 26 and 27 of Sendzimir were power driven and that the working rolls in turn were driven by their frictional contact with or thrust transmitted upon them by the driven idler rolls.

If there is any doubt about the matter, it is resolved by the prior publications discussed below, which establish that Sendzimir did drive the intermediate or idler rolls in some of his mills.

(b) The Publications.

"In the *Iron Age* July 23, 1942 appeared an article entitled 'Armco Introduces Sendzimir Mill'. In Fig. 1, it is stated 'The work rolls here are but 1¼" in diameter, and the *first intermediate rolls* are power driven.' (OX-95)" (Emphasis added.)

In another article entitled "Sendzimir Mill" appearing in the publication *Steel* dated November 30, 1942 and written by Sendzimir himself, it is stated:

"Because of the small diameter, either high grade alloy steels or tungsten-carbide can advantageously be used for the work rolls. Since it is preferable to drive the *intermediate rolls*, the work rolls have

no torque to transmit." (Emphasis added.)

It would not be practical to drive these small work rolls because they are incapable of transmitting the torque requirements. Sendzimir Patent No. '711, considered with the two publications, teach the use of tension and very small work rolls supported by intermediate rolls which are driven.

Lockwood had knowledge that the more recent mills of Sendzimir had driven backing rolls. He so stated in a letter to his counsel dated September 7, 1949, during the pendency of his application for patent. (OX-110, tab. 90). He acquired this knowledge prior to his invention, when Sendzimir visited the Cold Metal plant in Youngstown on or about December 4, 1942 in an effort to interest it in the manufacture of his mill.

In reporting on this visit to Mr. L. A. Beeghly, Lockwood discussed the features of this mill and stated:

"4. As non-driven work rolls can be used tungsten carbide work rolls may be employed."

I cannot consider either the Sendzimir patent or publications as direct anticipations of Lockwood. The patent is too uncertain in its disclosure of a backing roll drive, while the publications fail to cover the tension aspect of Sendzimir's patent.

However, taken together they indicate to me a lack of invention in Lockwood. They show that Sendzimir had the same basic concept as Lockwood, but that it was not clearly stated in the patent. In 1942, anyone familiar with both the patent and articles could have produced a Sendzimir mill which would have been an anticipation of Lockwood.

Bliss claims that Alonzo B. Montgomery, formerly an employee of Cold Metal, was really the one who conceived the idea upon which the Lockwood patent was granted. Bliss relies upon correspondence between Lockwood and his attorney, William H. Webb, to establish that Lockwood was not the inventor.

In his letter of February 8, 1943 to Mr. Webb, inquiring about the patentability of the concept, Lockwood stated:

"Some years ago Mr. Montgomery proposed the idea of driving the backup rolls on a 4-high mill having in mind various advantages which could be secured from such procedure. He has done some work on this from time to time meanwhile, but we have not actually got around to doing anything about it until quite recently. When Mr. Sendzimir got in touch with us a couple of months ago and began to expound the advantages of his mill, we again had brought to our attention the advantage of very small work rolls. The Sendzimir mill has so many apparent mechanical defects and is such a difficult mill to maintain, according to Signode, that it seemed to be almost too much of a mill to go ahead with on a commercial basis in order to secure its alleged advantages, especially from the standpoint of the small work roll.

"It would appear that Mr. Montgomery's ideas are far more simple and that all the advantages claimed by Sendzimir and others with respect to a small work roll can be secured in a 4-high mill arranged along the lines as conceived by Mr. Montgomery. We have in our files some previous data about this matter, and in fact, Mr. Montgomery sponsored the idea prior to our departure from our old plant on Mahoning Avenue.

"Montgomery would drive the backing up rolls on a mill arranged in accordance with the regular Steckel mill pull type of construction with the exception that he would transmit part of the power through the two backup rolls. This might be a substantial part of the power, perhaps as much as 50%, maybe even more, and actual practice would have to develop the preferred proportioning of the power, which probably would also vary de-

pending upon the gauges rolled and the quality of the materials rolled. To avoid skidding, he would prefer to drive both backup rolls, this being of importance, particularly where very small work rolls were used. We have in mind at the present time rigging up one of our 8″ mills with the drive on the backup rolls and will probably employ something like 25 HP per roll, or may drive with a single motor of about 50 HP, although at the moment the exact amount of the power used is not so important."

Lockwood outlined to Webb ten advantages of such a mill. He further stated:

"I asked Mr. Lamb if he had ever heard of a mill arranged according to Mr. Montgomery's ideas and he said that he had not, but that perhaps a drive of this sort had been attempted by someone in the past. We have no knowledge of such a drive. The old 3-high sheet mills had drives on the backup rolls; however, these mills were not antifriction mills. The working or "baby" rolls as it was generally termed, was an idling roll and the mill itself was a slow speed mill used for rolling short pieces and not coils. Also it was never employed for cold rolling.

"Please consider the above and based upon your knowledge of the prior art, let us know what chances you think there would be to secure a patent on the idea."

Lockwood either did not know of or did not remember the disclosures in Steckel Patents '670 and '017 and Montgomery Patents '122 and '107, which were issued to his own company, Cold Metal. These patents suggested driving the backing rolls of 4-high mills.

Bliss claimed that Lockwood had knowledge of backing roll driven mills because of his employment at Edgar T. Ward Co. where it is claimed mills of that type were in operation, his visits to the plant of Athenia in connection with infringement claims of Steckel '016 and '195 patents and his attendance upon the trial of cases involving the Cold Metal patents.

This is circumstantial evidence and while it indicates that Lockwood could have known about mills of this type, it falls short of proving that he had actual knowledge.

Mr. Webb replied under date of February 18, 1943, the caption of his letter being "Re Montgomery's proposal for driving the backing rolls." He said:

"I have given consideration to this proposal and am of the opinion that it will not be possible to obtain patent protection thereon for the reasons stated below.

"It is not new to drive the backing rolls on a 4-high antifriction bearing mill. Nor is it new in mills of this type to employ small working rolls * * *"

Mr. Webb pointed out that a number of such mills were built and sold by Standard Machinery Co. between 1926 and 1930. One of the mills was the General Electric mill at Cleveland which I previously held anticipated Lockwood's Claim 2.

Mr. Webb stated in his letter to Lockwood that the use of small work rolls per se was not new. It had been disclosed not only by Steckel, but also in prior patents. Furthermore, Steckel had also disclosed the combination of strong forward tension and small work rolls.

Mr. Webb pointed out in his letter that a number of the advantages claimed by Lockwood were disclosed in the Steckel all-pull mill or in part-pull part-drive mills or in mills with small work rolls which was well known in the art. Mr. Webb concluded his letter with the following:

"In view of the above, and particularly in view of the Fansteel and American Steel & Wire Company mills in which small work rolls are employed in conjunction with the driving of the backing rolls, I feel that there is little, if any, chance

of obtaining patent protection on Mr. Montgomery's suggestion. Accordingly, I recommend against the filing of an application thereon."

If the facts stated in Lockwood's letter to Webb had been true, then he would not be the inventor. Evidence was offered by Lockwood to prove the true facts. This is permissible even though the evidence contradicts the letter. It is the duty of the Court to determine the facts and this cannot be done without hearing all the evidence.

Lockwood, contrary to what was stated in his letter, testified that Montgomery's idea was only to use enough power on the backing rolls to overcome the standing friction in the mill and not to operate it; that Montgomery mentioned a 2 to 3 h. p. motor for this purpose.

Lockwood wrote a notation to this effect on his carbon copy of the letter of February 8th to Webb. This notation was, of course, a self-serving declaration and cannot be given much weight.

Lockwood's testimony, however, was corroborated by Louis Taylor, a Cold Metal employee, who testified that Montgomery in 1940 or 1941 wanted to apply power to the bottom backup roll. The amount suggested was from 2 to 5 h.p. which was to be just enough to compensate for friction and inertia. Taylor said that he heard nothing from Montgomery after his proposal and presumed that he had abandoned the idea. Taylor testified that Lockwood's new mill was radically different in that Lockwood drove both backing rolls with substantial power.

If there was any doubt about the matter, it was removed by the testimony of Alonzo B. Montgomery who testified that he was not the inventor of Lockwood's patent. He verified that his suggestion had been merely to supply sufficient power to the backing rolls to relieve friction so that the only pull would be on the strip.

A point was made by Bliss at the trial that Lockwood lacked engineering training, the inference being that he could not have been an inventor. When asked by Bliss's counsel to define horsepower, Lockwood was unable to do so. This boomeranged against Bliss when it asked its own witness Stanford Friedman, who was a graduate engineer, to define horsepower and he likewise was unable to do so. Friedman testified that he had forgotten the definition.

While Lockwood was not an engineer, he did have forty years of practical experience in the rolling mill industry. There is nothing in the patent laws requiring an inventor to be an engineer or to have scholastic training. We must not forget that many good inventions have been made by non-engineers, who had good practical knowledge and experience.

I find, from all the evidence, that Lockwood was the inventor.

However, Mr. Webb's letter of February 18, 1943, does show the thinking at that time of an able lawyer, skilled in patent matters, that Lockwood's conception with driven backing rolls supplying up to 50% or more of the power was not patentable. Later correspondence indicates Mr. Webb's feeling that only limited patent protection might be secured. This feeling was based on the advantages claimed which I think are inherent in the mill and not in Lockwood's method.

I, therefore, find Lockwood Patent No. 2,706,422 to be invalid:

(1) As lacking in invention

(2) Because anticipated by the Athenia mills

Claim 2 is anticipated by the General Electric mill, and, therefore, invalid.

I consider the mills upon which Bliss requested an adjudication of infringement as coming within the scope of the patent, if valid. The basic mill structure as shown in (Exhibit B) attached to the complaint comes within the description of that upon which the Lockwood method was to be carried out.

The results of tests run on two such mills were introduced by Cold Metal. The mills, manufactured by Bliss, were

those of the Newman-Crosby Steel Co. and the Revere Copper & Brass Co.

On the Revere mill, the tests showed a range of tension in relation to the total power (mill roll power plus tension power) of from 15.6 to 28.3%. Tension in relation to the power supplied to the backing rolls ranged from 18.4 to 39.4%.

On the Newman-Crosby mill, the range of tension in relation to total power was from 18.2 to 48.9%. In relation to the power supplied to the backing rolls the tension ranged from 22.3 to 95.8%.

While these values are within the Lockwood claims, it is interesting to note that every one of the values for tension power to total power falls within that range which Lockwood said was conventional for ordinary cold rolling—from about 20 to 50%. Again, indicating that the Lockwood method is no more than the embodiment of tension, traditionally used on working roll drive mills, on a backing roll drive mill.

### Summary

Steckel Patent No. 1,779,195 is valid and infringed by the following mills:

| OX–2 | Page Nos. | Item |
|---|---|---|
| | 8–9 | 4 |
| | 12–13 | 8 |
| | 12–13 | 9 |
| | 12–13 | 10 |
| | 12–13 | 11 |
| | 12–13 | 14 |
| | 12–13 | 16 |
| | 12–13 | 17 |
| | 12–13 | 19 |
| | 12–13 | 20 |
| | 14–15 | 21 |
| | 14–15 | 22 |
| | 14–15 | 23 |
| | 14–15 | 24 |
| | 14–15 | 26 |
| | 14–15 | 31 |
| | 14–15 | 37 |
| | 16–17 | 38 |
| | 16–17 | 39 |
| | 16–17 | 40 |
| | 16–17 | 42 |
| | 16–17 | 45 |
| | 16–17 | 46 |
| | 18–19 | 71 |

The parties shall hereafter reach a determination as to the amount of damages due Cold Metal from Bliss for the above mills based on the United formula.

The mills listed as Items 1 and 8 on pages 8–9 of OX-2 were furnished to the user by Bliss without the work rolls. The question of Bliss' liability for so doing has not been adequately presented and the parties may submit briefs on this point. As of this time they can not be considered infringements.

The mills listed as Items 1 to 4 on pages 20–21 of OX-2 were manufactured by Bliss for foreign users. It was not shown that they were completely assembled in the United States. Further proof may be submitted on those mills by deposition, if the parties desire. No finding of infringement can be entered at this time as to the foreign mills.

Steckel Patent No. 1,744,016 is valid, but limited to work rolls six inches or under and tensions of 49% and over. So limited I find no infringement of that patent by the mills in suit.

Lockwood Patent No. 2,706,422 is invalid for lack of invention and anticipation.

None of the parties to any of these actions is to recover costs. In the trial of the consolidated cases the presentation of evidence was in an integrated manner, and evidence admitted in one case was considered in all of the cases, so far as relevant. During the trial the designation proponents (of the patents) and opponents was used for the two sides, rather than individual designations as in the captions of the several suits. Between the proponents and opponents each side was successful with respect to some of the many issues involved. Therefore, in my judgment, it is entirely proper that each party bear its own costs.

This memorandum is adopted as findings of fact and conclusions of law. Judgment will be entered in accordance therewith.

148

On Motion of E. W. Bliss
Company to Correct
Opinion and Order

WEICK, District Judge.

Plaintiff, E. W. Bliss Company, has moved that the opinion and order of the Court entered in Equity Case No. 5402 be amended by striking the following items from the list of mills found to infringe Steckel Patent No. 1,779,195:

OX-2 Page Nos. 8–9 Item 4
 12–13 8
 14–15 21
 16–17 42

Defendants acquiesce in this regard, stating that the charge of infringement has been withdrawn against Items 8 (pp. 12–13) and 42 (pp. 16–17), that Item 21 (pp. 14–15) was charged only to infringe Steckel Patent No. 1,744,016, and that Item 4 (pp. 8–9) should be considered along with Items 1 and 8, pages 8–9 OX-2, on which the determination of infringement was reserved pending the filing of briefs.

However, defendants contend that all items listed in the opinion and order as infringements of patent '195 which were not the subject of proofs at the trial should also be stricken and ruling reserved pending an accounting.

Keeping these infringing mills in is favorable to the defendants and plaintiff has not objected thereto. I do not understand why defendants want them deleted.

The finding of infringement of patent '195 by the mills challenged by defendants was based on their physical structure. They were all mills of the 4-high type with roller bearings on their backing roll necks. They were such at the time of manufacture, the time of trial, and would be the same if deleted and reserved for an accounting. All the facts necessary to prove infringement by those mills was contained in OX-2, notwithstanding that they were not the subject of detailed proofs at the trial.

There would be nothing to be gained by striking these further mills from the list of infringements of patent '195, and

to do so would thwart the Court's intention to make the most expeditious disposition of this protracted litigation as possible, consistent with the rights of the parties.

It will, therefore, be ordered that the following mills be deleted from the list of those found to infringe Steckel Patent No. 1,779,195:

OX-2 Page Nos. 8–9 Item 4
 12–13 8
 14–15 21
 16–17 42

and that jurisdiction be reserved to determine infringement of said patent by the mill described in Item 4, OX-2 Pages 8–9.